884 F.2d 288
 58 USLW 2164, 11 Employee Benefits Ca 1941
 FARM KING SUPPLY, INCORPORATED INTEGRATED PROFIT SHARING
PLAN AND TRUST, an Employee Benefit Plan, Richard H. Severs,
Rick A. Severs, Randall M. Severs, Bradley D. Severs, Azelia
M. Severs, Jerry D. Mayo and William A. Oates, Jr., Trustees
of the Farm King Supply Incorporated Integrated Profit
Sharing Plan and Trust, Plaintiffs-Appellants,
v.
EDWARD D. JONES & COMPANY, a Partnership, Defendant-Appellee.
 No. 88-3382.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 1, 1989.
Decided Aug. 23, 1989.
 
 Edward F. Sutkowski, Dan O'Day, Dean B. Rhoads, Sutkowski & Washkuhn, Peoria, Ill., for plaintiffs-appellants.
 Robert V. Dewey, Jr., Mark Howard, Richard Molchan, Timothy L. Bertschy, Heyl, Royster, Voelker & Allen, Peoria, Ill., John M. Clear, Leo J. Asaro, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for defendant-appellee.
 Before BAUER, Chief Judge, and CUMMINGS and RIPPLE, Circuit Judges.
 CUMMINGS, Circuit Judge.
 
 
 1
 The Farm King Supply, Inc. Integrated Profit Sharing and Trust (the "Plan"), a qualified employee benefit plan under the Employee Retirement Income Security Act, 29 U.S.C. Secs. 1001 et seq. ("ERISA"), and its co-plaintiff trustees appeal from the decision of the district court which determined that defendant Edward D. Jones & Co. ("Jones"), a brokerage firm, was not a fiduciary of the Plan as defined in ERISA and therefore not liable for losses suffered by the Plan allegedly as the result of Jones' breach of the duty of undivided loyalty owed by a fiduciary to a plan. We affirm.
 
 I. Facts and Proceedings Below
 
 2
 During the time in issue, the Plan was run by six trustees: Richard H. Severs, Rick A. Severs, Randall M. Severs, Bradley D. Severs, Azelia M. Severs, Jerry D. Mayo; William A. Oates was added in 1984.[1] Apparently the trustees were headed by Richard Severs, at one time the Plan's sole trustee, who was found to be "relatively knowledgeable" and was presumably sophisticated in the broad area of finance, having served as a director of the Citizens National Bank of Macomb, Illinois. Trustees Rick and Bradley Severs, also found to be "relatively knowledgeable" and well read regarding financial matters, both hold degrees in business administration, and the district court found the trustees generally to be aware and capable of respecting their fiduciary obligations. Moreover they were assisted by capable lawyers and accountants. Accordingly, unless there was clear error in the relevant factual finding, it may properly be concluded that the trustees were competent.
 
 
 3
 Jones is a brokerage firm headquartered in St. Louis, Missouri, and maintains a sales office in Macomb. Jones is an underwriter for issuers of securities, placing the securities with buyers and in return receiving commissions from the issuers. From 1975 through 1980 Jack Cahill was Jones' sales representative in the Macomb area. Consistent with his job, in December 1975 Cahill began calling on the trustees of the Plan regarding potential investments. In March 1978 Cahill first succeeded in selling an investment to the Plan.
 
 
 4
 Cahill was aware that the Plan's major investments were in certificates of deposit. As part of his sales pitch, Cahill urged the Plan's trustees to diversify its portfolio, citing the diversification requirement of ERISA. The trustees agreed to purchase investments from Cahill provided the investments proved sound. Typically, Cahill would meet with the trustees and, based on their stated preference for safe, profit-sharing investments, present a few securities recommended by him specifically for the Plan and answer any questions the trustees may have had. Generally, the trustees would later meet privately and then advise Cahill as to whether they had decided to make a purchase for the Plan's benefit.
 
 
 5
 In July 1979 Cahill advised the trustees to open a Kemper Short Term Money Market Fund. In accordance with Kemper's usual routine, Kemper mailed monthly statements to Jones, the broker of record, as well as to the Plan. Consequently, Cahill was able to monitor this amount of money at the Plan's disposal, as well as take note of recent deposits, and thus tailor his recommendations to the extent of the Plan's cash reserves.
 
 
 6
 Cahill was transferred to Jones' St. Louis office in December 1980. At that time well over half the Plan's investments, both in terms of numbers and value, had been purchased through Jones. Cahill was succeeded by Gary Aleff, who was introduced to the Plan's trustees by Cahill prior to his departure. Aleff began calling on the trustees in December 1980 and tried, apparently without much success, to set up a meeting to solicit the trustees' interest in some more investments for the Plan. The trustees finally agreed to meet with him in June 1981. This meeting, in which Aleff recommended a few securities, resulted in the trustees' decision to purchase through Jones a $100,000 securities investment.
 
 
 7
 Aleff continued to meet with the trustees, much the same as Cahill had. He would make presentations recapping the performance of those investments purchased through Jones, advising the trustees which to hold and which to sell and offering the trustees a choice of recommended investments, and the trustees would then discuss amongst themselves which, if any, they wanted to purchase. At some point, the date is unclear, the trustees asked Aleff whether there was some way other than typical ledger sheets to track the Plan's investments. Aleff volunteered to provide portfolio summaries, the first of which was dated July 1982, which essentially listed information regarding the Plan's investments[2] and also included advice, apparently unsolicited, as to the course of action the Plan should take with respect to each investment.
 
 
 8
 By June 1982 approximately 99% of the Plan's assets, constituting in excess of $1,000,000, was in investments recommended and purchased through Jones. Unfortunately Aleff proved to be less successful than Cahill and the trustees became dissatisfied with the performance of some of the investments he had recommended. By November 1982 the trustees began purchasing investments through brokers other than Jones, and in fact the Plan purchased its final investment through Jones in December 1982 despite attempts by Aleff to regain the trustees' confidence. Aleff even prepared a portfolio summary in April 1983 and unsuccessfully continued through 1983 to solicit sales to the trustees.
 
 
 9
 In 1984 and 1985 the Plan suffered significant losses as a result of investments recommended and purchased through Jones in 1982. The losses, which are the subject of this lawsuit, need not be detailed here; suffice to say they arose through three investments made pursuant to Aleff's solicitations in 1982 and total in excess of $300,000.[3]
 
 
 10
 In March 1985 the Plan and its trustees brought this suit, alleging that Jones breached its duty of undivided loyalty to the Plan as a fiduciary under ERISA.[4] In response, Jones denied it was a fiduciary or that it breached its duty, and also filed a counterclaim in the alternative seeking indemnification from certain trustees in the event that it was later found to have breached fiduciary duties under ERISA. After a three-day bench trial the district court determined that Jones was not a fiduciary of the Plan within the meaning of ERISA, 29 U.S.C. Sec. 1002(21)(A). Since the district court held that Jones was not a fiduciary, it obviously had no occasion to reach a decision on either any duties putatively owed to the Plan by Jones or on the counterclaim. Judgment was ordered for defendant in November 1983, prompting the Plan and its trustees to appeal.
 
 II. Analysis
 
 11
 The first question to decide is whether Jones is a fiduciary as defined in ERISA. If Jones is not a fiduciary, then of course it cannot be said that it breached any fiduciary duties owed to the Plan, nor is Jones' counterclaim for indemnification cognizable.
 
 
 12
 The Plan and trustees argue that Jones falls within the definition of a fiduciary under ERISA as a person who " * * * renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other properties of such plan, or has any authority or responsibility to do so * * *." 29 U.S.C. Sec. 1002(21)(A)(ii). The Department of Labor has adopted unassailed regulations further explaining when a person is deemed to be providing investment advice under Section 1002(21)(A)(ii) of ERISA:
 
 
 13
 (1) A person shall be deemed to be rendering "investment advice" to an employee benefit plan, within the meaning of [29 U.S.C. Sec. 1002(21)(A)(ii) ] only if:
 
 
 14
 (i) such person renders advice to the plan as to the value of securities or other property, or makes recommendations as to the advisability of investing in, purchasing, or selling securities or other property; and
 
 
 15
 (ii) such person either directly or indirectly ...
 
 
 16
 (A) has discretionary authority or control, whether pursuant to agreement, arrangement or understanding, with respect to purchasing or selling securities or other property for the plan; or
 
 
 17
 (B) renders any advice ... on a regular basis to the plan pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the plan ... that such services will serve as a primary basis for investment decisions ... and that such person will render individualized investment advice to the plan based on the particular needs of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments.
 
 
 18
 29 C.F.R. Sec. 2510.3-21(c)(1). In keeping with the remedial purpose of ERISA, this Court liberally construes the term fiduciary as used in the Act. See Thornton v. Evans, 692 F.2d 1064 (7th Cir.1982); Mutual Life Ins. v. Yampol, 840 F.2d 421 (7th Cir.1988); see also American Federation of Unions v. Equitable Life Assurance Society, 841 F.2d 658 (5th Cir.1988). Whether a person is a fiduciary is determined by an objective standard; it matters not that the person may subjectively believe that he or she is not a fiduciary as long as the requirements under the regulations are met. See Freund v. Marshall and Ilsley Bank, 485 F.Supp. 629, 635 (W.D.Wis.1979); cf. American Federation of Unions, 841 F.2d at 662-663.
 
 A. Discretionary Authority or Control
 
 19
 The plaintiffs contend that Jones should be held as a fiduciary under either 29 C.F.R. Sec. 2510.3-21(c)(1)(ii)(A) or (B), supra. Beginning with the first, the trustees argue that Jones had "discretionary authority or control * * * with respect to purchasing or selling securities * * * for the plan." This argument is premised on the fact that for over four years the Plan purchased securities nearly exclusively from Jones, securities which were selected according to Jones' discretion as suitable for the Plan's goals. As the district judge concluded, this assertion is clearly without merit.
 
 
 20
 As we noted in Forys v. United Food & Commercial Workers International Union, 829 F.2d 603, 607 (7th Cir.1987), "a fiduciary is a person who exercises any power of control, management or disposition with respect to monies or other property of an employee benefit fund, or has the authority or responsibility to do so," quoting H.R.Rep. No. 533, 93rd Cong., 2d Sess. 11, reprinted in 1974 U.S.Code Cong. & Admin.News 4639, 4649. And the Supreme Court, in Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 142-143, 105 S.Ct. 3085, 3090-3091, 87 L.Ed.2d 96, observed that, "[a] fair contextual reading of [ERISA] makes it abundantly clear that its draftsmen were primarily concerned with the possible misuse of plan assets ..."
 
 
 21
 Neither Jones nor any individual employees had any discretion with respect to the disposition of any of the Plan's assets. Jones acted only as broker or sales organization. It could not control or exert influence over how the Plan's assets were managed or disposed. All Jones did was select a few securities from its limited pool of commissionable securities and propose to the trustees that the Plan purchase from among this select group.[5] The Plan decided which securities to purchase and in fact would choose from among the few recommended by Jones during the presentations. The only discretion that Jones had was to choose which few securities to recommend to the Plan. But this surely was not discretion within the meaning of ERISA nor within the meaning of the common sense definition of the term. Rather the relationship was simply salesmanship, matching the customer's desires with available inventory. Those cases which hold that the person or firm was a fiduciary have a common theme conspicuously absent here, viz., the authority to exercise control unilaterally over a portion of a plan's assets, not merely to propose investments. See, e.g., American Federation of Unions, 841 F.2d at 662-663; Benvenuto v. Connecticut General Life Ins., 643 F.Supp. 87, 90 (D.N.J.1986); Brock v. Self, 632 F.Supp. 1509, 1520 (W.D.La.1986); Eaton v. D'Amato, 581 F.Supp. 743, 749 (D.D.C.1980). The regulations take the same tack.
 
 
 22
 Finally, the position of the Department of Labor, as stated in its comments accompanying the adoption of the regulatory definition of "investment advice," is clear:
 
 
 23
 a plan fiduciary may not delegate such discretionary authority to a broker-dealer in the execution of a securities transaction as to make such broker-dealer a fiduciary with respect to the plan within the meaning of [29 U.S.C. Sec. 1002(21)(A) ] ... without disclosing to such broker-dealer that it will be acting as a fiduciary with respect to the plan in such transaction.
 
 
 24
 40 Fed.Reg. at 50843. Since the trustees never delegated discretionary authority to Jones, there of course was no disclosure to Jones "that it will be acting as a fiduciary with respect to the plan."
 
 B. Rendering Investment Advice
 
 25
 Alternatively, the trustees assert that Jones should be deemed a fiduciary because it rendered individualized investment advice based on the particular needs of the Plan, which in turn relied upon the advice as a primary basis for investment decisions, pursuant to some mutual agreement, all within 29 C.F.R. Sec. 2510.3-21(c)(1)(ii)(B) supra, and was compensated either directly or indirectly for this service. 29 U.S.C. Sec. 1002(21)(A)(ii) supra. The starting point of the analysis is whether under the regulation there existed a mutual agreement or understanding between the parties that Jones' advice would be the primary basis for the Plan's investment decisions. The district court, after hearing testimony from several witnesses and reviewing documentary evidence, found that there was no mutual understanding that Jones' advice would be the primary basis for Plan investments (mem. op. 13).[6] On review, this Court will reverse such a factual determination only on a showing that it was clearly erroneous; that standard has not been satisfied here.
 
 
 26
 The trustees point to Eaves v. Penn, 587 F.2d 453 (10th Cir.1978), as evidence of the wide sweep given to the meaning of "fiduciary" under ERISA. In Eaves, the Tenth Circuit cited approvingly from Little and Thrailkill, Fiduciaries under ERISA: A Narrow Path to Tread, 30 Vanderbilt L.Rev. 1, 4-5 (1977), "The broadness of the definition [of fiduciary] is readily apparent. * * * Because the definition includes those who render investment advice for a fee, the following persons may be considered fiduciaries: * * * stock brokers or dealers who recommend certain securities and then participate in the acquisition or disposition of those securities and receive a commission for their services," 587 F.2d at 458. That may be so, but under the appropriate departmental regulations some sort of an agreement or understanding must have existed between the parties, not necessarily that Jones would serve as a fiduciary, but that Jones would provide to the Plan individualized investment advice which would be the primary basis for the Plan's investment decisions.
 
 
 27
 There is nothing in the record to indicate that Jones or its employees had agreed to render individualized investment advice to the Plan, nor that the trustees so agreed. The only "agreement" between the parties was that the trustees would listen to Jones' sales pitch and if the trustees liked the pitch, the Plan would purchase from among the suggested investments, the very cornerstone of a typical broker-client relationship. And this "agreement" was subject to unfettered unilateral termination by either party for substantive reasons, viz., when the trustees became dissatisfied with Jones' performance or when Jones failed to realize a profit from solicitations of the Plan or for no particular reason at all. In fact there is no indication in the record that the "agreement" was ever terminated; the trustees simply declined to meet further with Jones' representative Aleff. Indeed, the district court found that the trustees informed Cahill and Aleff that, as both men believed, they were competing with representatives of other financial institutions for the Plan's business. Further, any special attention offered by Aleff to the Plan, such as portfolio summaries, was obviously provided to foster more sales from such a lucrative customer. Jones offered the plan individualized solicitations much the same way a car dealer solicits particularized interest in its inventory.
 
 
 28
 Nor can the trustees point to conduct on their part which indicates they believed the requisite agreement had been reached between the Plan and Jones. The trustees never even supplied Jones with its investment portfolio. Jones could not provide "individualized investment advice to the Plan based on the particular needs of the plan"[7] without knowing the composition of the Plan's portfolio. See note 2, supra. Moreover, it would certainly be folly to rely on the advice of a broker lacking such fundamental information, and the trustees themselves were not without business experience and sophistication. In the absence of such information, Jones' suggestions as to investments could not constitute rendering individualized advice "regarding such matters as among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments" (see note 7, supra ). And although additional trustees were added to the Plan in 1982, no mention was ever made of adding Jones or one of its sales employees. Finally, the trustees were aware that Jones' only source of compensation from these transactions was from the commissions offered by the issuers of the securities.[8]
 
 
 29
 The situation here mirrors that in American Federation of Unions. There an insurance company successfully urged a health and welfare plan to self-insure, while also recommending that the plan purchase excess coverage from it for larger claims. The health and welfare plan ultimately became insolvent, in part because of the actuarial unsoundness of the self-insurance program. The plan then sued the insurance company, alleging that the insurance company was a fiduciary based upon the individualized advice rendered to the plan regarding self-insurance. The Fifth Circuit disagreed, noting that "[s]imply urging the purchase of its products does not make an insurance company an ERISA fiduciary with respect to those products." 841 F.2d at 664. The same can be stated here. The trustees listened to some of Jones' solicitations because they proved successful in the past. And Jones of course nurtured customer loyalty. But neither Jones nor the trustees interpreted this situation as an agreement for Jones to provide individualized advice upon which the trustees would rely as a primary basis for the Plan's investment decisions.
 
 III. Conclusion
 
 30
 The trustees and the Plan have failed to show that the district judge's factual findings are clearly erroneous. To the contrary, they are fully supported by the record. Jones was not a fiduciary but instead was a broker, and Cahill and Aleff were among its salespersons. Only the trustees had discretionary authority or control over the Plan's assets; all Jones did was try to convince the trustees to exercise some discretionary authority in such a way as to benefit Jones. The trustees and Jones never had an agreement or understanding that Jones would provide individualized investment advice to the Plan. The trustees merely listened to Jones' presentations as long as it was worthwhile. When it was no longer worthwhile, i.e., when the investments began performing poorly, the trustees stopped listening. Consequently, there is no basis upon which to conclude that Jones was a fiduciary as defined in ERISA and the regulations thereunder.
 
 
 31
 The decision of the district court is affirmed.
 
 
 
 [1]
 We shall refer to these individuals in the collective as the trustees
 
 
 [2]
 The portfolio summaries included just those investments sold by Jones, not all investments held by the Plan. There is no evidence that Jones was ever apprised nor aware of the Plan's complete investment portfolio, although at this time most of the Plan's investments were purchased through Jones
 
 
 [3]
 The $300,000 loss is based on the Plan's calculations
 
 
 [4]
 This is apparently the first time the trustees have considered Jones a fiduciary under ERISA, since in numerous Internal Revenue Service reporting documents the trustees failed to identify Jones as such. For example, in 1981 on an IRS form requesting information on the name and address of each fiduciary for 1981, the trustees omitted Cahill, Aleff and Jones. Similarly, for years ending January 1980, 1981, 1982 and 1983, the trustees indicated that there were no transactions between the Plan and a fiduciary. For years ending January 1981 and 1982, the trustees indicated that no fiduciary had received anything of value from the Plan. And for years ending January 1983 and 1984, the trustees stated that the Plan's investments were administered by Richard Severs and Northeast Partners, respectively, again omitting any reference to Jones or its employees. Finally, for the year ending January 1984, the trustees responded on an IRS form that the Plan had not terminated any investment managers in that year, despite its 1983 decision to terminate its dealings with Jones
 
 
 [5]
 In fact the securities recommended by Jones were often alternatively framed. Thus while at one time the Plan's assets may have been predominately comprised of securities purchased through Jones, the trustees purchased only about half of the securities recommended by Jones
 
 
 [6]
 The trustees argue that this finding of the district judge was a mixed finding of fact and law and accordingly is independently reviewable on appeal. See Schuneman v. United States, 783 F.2d 694, 699 (7th Cir.1976). But this issue, whether the parties agreed that Jones would provide investment advice which would be the primary basis for investments, turns on the evidence heard at trial. Did the parties have such an agreement? The issue here is comparable to the corresponding "meeting of the minds" component of contract cases. Whether a meeting of the minds exists is an issue for the trier of fact. E.g., Stanish v. Polish Roman Catholic Union of America, 484 F.2d 713, 723 (7th Cir.1973); Weissman v. Cole Products, 269 F.2d 340, 342-343 (7th Cir.1959). Consequently, the finding in question made by the district judge is solely a factual matter and thus reversible only upon a showing that the determination was clearly erroneous. See Fed.R.Civ.P. 52(a). On review, this Court accepts the district judge's factual determination, absent clear error, and reviews independently only the manner in which the law was applied to that factual determination
 
 
 [7]
 29 C.F.R. Sec. 2510.3-21(c)(1)(ii)(B)
 
 
 [8]
 In that same article cited in Eaves, the authors acknowledge remarks made by then Solicitor of the Labor Department, William J. Killberg, concerning relevant considerations in determining whether an advisor is a fiduciary:
 * * *
 (4) the extent to which the relationship of the consultant to the plan is subject to the prohibition against party in interest transactions.
 Little and Thrailkill, supra, at 5-6, quoting Address by William J. Killberg, Nov. 21, 1974, reprinted in 3 Pension & Profit-Sharing (P-H) p 135, 013 (1974). The rationale is obvious; if the trustees are aware that the consultant's compensation is tied to transactions in which the Plan participates, the trustees are less likely to rely on the consultant's advice. Here the trustees, well aware that Jones' only source of compensation was from underwriting commissions generated by sales to the Plan, did not accord Jones' advice as a primary basis for investments; their actions bear this out. Moreover, because of the compensation scheme, the trustees had to be aware that if Jones were truly a fiduciary by providing advice which the trustees were relying upon as a primary basis for the Plan's investments, then every investment made through Jones would violate the party in interest prohibited transaction rule of ERISA, 29 U.S.C. Sec. 1106.