**George A. SCHLOEGEL and the Hancock Bank Profit Sharing Plan, Plaintiffs,**

v.

**Laurie BOSWELL, Defendant.**

Civ. A. No. S89–0330(R).

United States District Court,
S.D. Mississippi, S.D.

Aug. 5, 1992.

William V. Westbrook, III, Gulfport, Miss., for plaintiffs.

James O. Dukes, Gulfport, Miss., for defendant.

## MEMORANDUM ORDER

DAN M. RUSSELL, Jr., District Judge.

This case came on for trial before this Court sitting without a jury on March 23, 1992. The parties, having submitted post-trial briefs in support of their respective positions on the issues, this Court proceeds to enter its findings of fact and conclusions of law. The action is brought for statutory damages arising under the Employee Retirement Income Security Act of 1974 (hereinafter "ERISA"), 29 U.S.C. Section 1001, *et seq.*

### Facts

The plaintiffs in this action are George A. Schloegel (hereinafter "Schloegel"), a resident of Gulfport, Harrison County, Mississippi, and the Hancock Bank Profit Sharing Plan (hereinafter "the Plan". The Plan, which is an ERISA qualified profit sharing plan, is maintained by Schloegel's employer, the Hancock Bank of Gulfport, Mississippi (hereinafter "the Bank"). At all relevant times, Schloegel was a qualified participant and beneficiary under the Plan.

The defendant, Laurie Boswell (hereinafter "Boswell"), is a resident of the State of Louisiana, and at all relevant times he was licensed as an insurance agent by the State of Mississippi.

Mr. Boswell was employed as a pension and profit sharing consultant from 1954 until his retirement in 1990.

In 1958, while the defendant was a salaried employee with the insurance firm of Marsh and McLennen, he sold the Bank life insurance for its pension plan. When Boswell left Marsh and McLennen in 1963, he was allowed to take the Hancock Bank business with him, and from 1963 to 1979, the defendant received commissions from the insurance owned by the Bank's pension plan.

It is uncontested that Boswell had a close relationship with the Bank from 1958 until the early 1980s. He was a personal friend of the Bank's top management, and was frequently present on the Bank's premises.

Of particular importance is the fact that Boswell had ready access to salary information of the Bank's employees and was viewed by Schloegel, Martha Peterman, the Plan's Administrator, and others at the bank as an expert on insurance and retirement matters. Mr. Schloegel, a 35–year employee of the Bank, and now President, testified that Mr. Boswell was an insider with Hancock Bank with information and privileges which exceeded those of anyone with the possible exception of Leo Seal, Jr. (Chairman of the Board). Schloegel further stated that the Bank leadership had absolute confidence in Boswell's recommendations.

Exhibits in the form of correspondence from Boswell Company, Inc. to the Bank personnel and others from 1970 to 1986 indicate that the defendant held himself out as a pension and profit-sharing consultant.

From 1975 through 1984, Boswell was paid $200.00 per month for consultation services. He contends that this fee was limited to consultation on the Bank's Provident Life Insurance medical plan; however, no written memorandum exists which supports this limitation.

In 1979, when the pension plan was changed, Mr. Boswell ceased receiving commissions in connections with insurance purchased by that plan. According to his testimony, the defendant "was asked to give [the Bank] advice on things other than pension, profit sharing and group, in which I was already being paid." (Transcript at 85). Negotiations with Schloegel and Mrs. Peterman resulted in Boswell being authorized to receive an additional $250.00 per day plus expenses.

In 1976, Boswell recommended changes needed to bring the Bank's pension plan into compliance with new legal requirements of ERISA. He also complied with the request of Charles Eastland, Trust Officer for the Bank, that he provide a list of similar changes that would be required for the profit sharing plan. The defendant asserts that he received no compensation for this service with respect to the Plan.

In 1977, Boswell presented a proposal to several members of the Bank's top management, including Schloegel, that it would be to their benefit to use profit-sharing funds to purchase life insurance.

Purchasing of life insurance through a trust was characterized by the defendant as the cheapest way to buy life insurance in that it is paid with before tax dollars, with the insured being only responsible for PS-58 (the value attributed to term life protection) costs. Another advantage pointed out was third-party ownership which precludes the proceeds from going into the insured's estate in the event that he names anyone other than his estate as beneficiary.

As a result of the proposal and Schloegel's approval, the Plan purchased a New England Life Insurance Company policy on Schloegel's life, effective August 21, 1977. The policy had a face amount of $200,-000.00 with an annual premium of $4,417.00. Of this premium Boswell received commissions equivalent to 50 or 55 percent of the first year premium and 5 percent per year for the period that the policy was in force.

The New England policy remained in effect from 1977 until 1980 with all premiums being paid out of Schloegel's Plan account.

On May 6, 1980, in response to an inquiry from Charles Eastland regarding the wisdom of purchasing ordinary life insurance in a profit sharing plan, Robert W. Dowd of the consulting firm of Stevens & Associates of Jackson, Mississippi, wrote to Mr. Eastland.

While advising against the purchase of term insurance, Mr. Dowd approved of the purchase of insurance and added that "the premium ... must be less than 50% of aggregate employer contributions to a participant's account."

According to Ms. Peterman's testimony in reference to a letter to her from Robert W. Dowd dated August 28, 1980, it appears that she also had notice of the 50% limitation.

On July 31, 1980, in response to concerns expressed by Schloegel, Martha Peterman wrote to Boswell for his advice regarding whether to keep the New England policy or to "just keep the money in the Profit Sharing."

On September 5, 1980, Schloegel personally wrote Boswell regarding his insurance needs in general and particularly requesting an analysis of the New England policy emphasizing its necessity and cost. Apparently, the fact that Boswell wrote a considerable amount of insurance for New England caused some concern that there might exist a conflict.

Boswell responded to the aforestated inquiry in part by recommending that Schloegel drop the New England policy and purchase a replacement policy from Massachusetts Mutual Life Insurance Company (hereinafter "Massachusetts"). The Massachusetts policy was also for the face amount of $200,000.00, but at an annual premium of $3,800.00.

Effective December 17, 1980, the Massachusetts policy was purchased with funds from Schloegel's account in the Bank's profit sharing plan. Boswell also was paid commissions on the Massachusetts policy of approximately 50 or 55 percent of the

first year's premium and 5 percent of subsequent years' premiums.

At all relevant times, applicable federal income tax regulations provided that ordinary life insurance could be purchased without adverse tax consequences to ERISA qualified profit sharing plans only if less than 50 percent of the employer's contributions to the participant's profit sharing account were used to pay the premiums. This is referred to as the "50% Rule."

Boswell's testimony indicates that he was aware of the 50% Rule and its penalties at the time of the initial proposal, as well as afterward; however, he did not recall discussing the rule at any time with Schloegel or with other Bank personnel.

In 1987, Schloegel, apparently concerned about his decreasing profit sharing account balance, requested that Martha Peterman check into the matter. In response, and with the assistance of Charles Eastland, she gathered data and discovered that there was a violation of the 50% rule.

Ms. Peterman telephoned Boswell after meeting with Schloegel regarding the problem and upon hearing nothing from him after several months wrote to him. Her letter of July 8, 1987, set out the particulars of the problem noting, in part, that the ratio of the premiums paid to total employer contributions for Schloegel's account was equivalent to 106%. The letter closes with a request for a written solution within two weeks of the date of the letter.

Boswell met with Ms. Peterman and Mr. Eastland on July 22, 1987, to discuss possible solutions to the problem. The solutions proposed by Boswell were not satisfactory to Eastland and Peterman and the decision was made to take the cash surrender value of the Massachusetts policy and put it back into the Plan.

The plaintiffs demanded restitution by Boswell which was not forthcoming. This action followed.

## Discussion

### I. *Is the Plan a proper party plaintiff?*

The defendant correctly asserts that ERISA only specifically provides that civil actions may be brought by the Secretary of Labor or by a participant, beneficiary, or fiduciary. See 29 U.S.C. Section 1132(a).

As observed by the United States Court of Appeals for the Fifth Circuit in *American Federation of Unions v. Equitable Life Assurance Society,* 841 F.2d 658, 665–666 (5th Cir.1988):

> The Second Circuit has held that the list of potential plaintiffs in Section 1132(a) is exclusive, *see Pressroom Unions–Printers League Income Security Fund v. Continental Assurance Co.,* 700 F.2d 889, 892 (2d Cir.1983), *cert. denied,* 464 U.S. 845, 104 S.Ct. 148, 78 L.Ed.2d 138 (1983), while the Ninth Circuit has held that parties not listed in Section 1132(a), including unions, do have standing to sue. *See, Fentron Industries, Inc. v. National Shopmen Pension Fund,* 674 F.2d 1300, 1304–05 (9th Cir.1982).

The court of appeals in *Equitable* was not called upon to and did not disturb the trial court's holding that a Health and Welfare Fund was a fiduciary. Neither the status of plans as proper parties under ERISA nor this circuit's position regarding the exclusiveness of the list in Section 1132(a) was explored.

Notwithstanding the fact that its resolution might have no significant bearing upon the fundamental issues before this Court, the defendant's objection as to capacity, if raised in a timely fashion, might have presented an interesting question of law and fact. Timeliness, however, appears lacking.

The initial complaint in this action was filed in this Court on May 9, 1989. The singular plaintiff in the cause at that time was Schloegel. Of possible relevance in his answer was the defendant's fifth defense which generally alleged that the plaintiff lacked standing to assert the claim.

On May 7, 1990, the plaintiffs filed their Motion to amend and for joinder of the Plan as an additional party plaintiff. This motion was granted on June 22, 1990, by United States Magistrate Judge John M. Roper. A search of the record does not

indicate that the defendant amended his answer.

On the first day of the trial the parties submitted the pretrial order as a general exhibit which contained the provision that the "pleadings are amended to conform to this pretrial order." Nowhere on the pretrial order is it expressed that the Plan's status as a proper party is in dispute.

As set out by the United States Court of Appeals for the Fifth Circuit in *Morgan Guaranty Trust Co. of New York v. Blum,* 649 F.2d 342, 345 (5th Cir.1981), "any party who wishes to raise an issue of the capacity of any party to sue or be sued must 'do so by specific negative averment' in the appropriate pleading or amendment or be deemed waived."

It is this Court's holding that the defendant's decision to wait until after trial to assert this objection is untimely and is grounds for and constitutes waiver.

## II. *Statute of Limitations*

The defendant begins his brief by reasserting his argument that the plaintiffs' claims are barred in whole, or in the alternative, in part by the provisions of 29 U.S.C. Section 1113.

As observed by the defendant, this Court, by Memorandum Order of November 30, 1990, 751 F.Supp. 642, held that 29 U.S.C. Section 1113(a)(2) did not apply in the absence of any assertion of actual or constructive knowledge by the plaintiff. This Court, therefore, looked to 29 U.S.C. Section 1113(a)(1)—the six-year provision— and found that the final premium payment in 1986 on the Massachusetts policy was the "last action" which constituted a part of the alleged breach.

At this juncture, as contrasted with the prior motion, two new issues are raised: (1) the applicability of the former subsection (a)(2)(B) and or (2) whether the plaintiffs had actual knowledge under (a)(2)—formerly (a)(2)(A).

29 U.S.C. Section 1113(a)(2)(B), which was deleted by an amendment in 1987, states in pertinent part:

Section 1113(a) No action may be commenced under this chapter with respect to a fiduciary's breach of any responsibility ... or with respect to a violation of this part, after the earlier of—

(2) three years after the earliest date

(B) On which a report from which [the plaintiff] could reasonably be expected to have obtained knowledge of such breach or violation was filed with the secretary under this subchapter.

Although this Court does not question the potential applicability of the foregoing subsection, the facts before this Court would not seem to bring it into play.

The defendant does not present this Court with any specific "report" or entry therein from which the plaintiffs could have reasonably been expected to obtain knowledge of the violation charged. Arguably Form 5500 (Annual Return/Report of Employee Benefit Plan) could under other facts be such a report; however, considering the nature of the breach, such would not seem to suffice herein.

As previously noted, the plaintiffs made inquiries regarding the advisability of using plan assets to purchase life insurance and were advised that such was proper and desirable subject to the 50% Rule being complied with.

Under different facts one might argue that Mr. Eastland and/or Ms. Peterman should have continued their search to assure that the premiums were within allowed limits. Considering, however, Boswell's access to information and the reliance he had achieved in the eyes of Bank management, such would have been an unwarranted—in the absence of hindsight— duplication of effort.

In short, this Court finds that neither Schloegel nor the Plan had constructive knowledge of the violation of the 50% Rule as contemplated by 29 U.S.C. Section 1113(a)(2)(B).

Regarding 29 U.S.C. Section 1113(a)(2)(A), such clearly requires that "the plaintiff [have] actual knowledge of the breach or violation." Citing *Blanton v. Anzalone,* 760 F.2d 989 (9th Cir.1985), the defendant argues that the requisite knowl-

edge is that the act occurred and not that it constituted a violation.

This Court's search of the cases which have followed *Blanton* reveals no widespread adoption of this extension of 1113(a)(2)(A) and that this construction seems to be lacking in this circuit, as well as most circuits. Furthermore, this Court notes that *Blanton* relies primarily upon *United States v. Kubrick*, 444 U.S. 111, 118–25, 100 S.Ct. 352, 357–61, 62 L.Ed.2d 259 (1979). *Kubrick* was a medical malpractice action brought under the Federal Tort Claims Act in which the plaintiff had knowledge of his injury and delayed bringing his action until he was informed that it constituted possible malpractice. The court in *Kubrick* stated, in pertinent part:

> We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment. That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain. The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury.

*Id.* at 122, 100 S.Ct. at 359.

It was also observed by the court in *Kubrick* that the purpose of limitations statutes is to insure the reasonably diligent presentation of claims.

It is this Court's finding that under the facts herein, neither of the plaintiffs had knowledge that the acts of purchasing the subject insurance policies were injurious until 1987 and that the complaint is not barred under 29 U.S.C. Section 1113.

### III. *Was Boswell a Fiduciary of the Plan?*

The United States Court of Appeals for the Fifth Circuit in *American Federation of Unions, supra*, 841 F.2d 658, 662, set out the following:

> ERISA imposes a prudent man standard of care upon anyone acting as a fiduciary with respect to an employee welfare benefit plan as defined in the Act. 29 U.S.C. Section 1104(a) (1985). A person is considered an ERISA fiduciary if:

> "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises of any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."

29 U.S.C. Section 1002(21)(A) (1985).

The defendant relies heavily upon *Farm King Supply, Inc. v. Edward D. Jones & Co.*, 884 F.2d 288, 292 (7th Cir.1989), which cites *American Federation of Unions* as support for its conclusion that in order that a person or firm to be held a fiduciary a common theme—"the authority to exercise control unilaterally over a portion of a plan's assets, not merely to propose investments"—must be present.

This Court's reading of *American Federation of Unions*, particularly pages 662–63, which were emphasized by *Farm King*, leads it to conclude that this circuit is not inclined to be so restrictive of the term of fiduciary.

This Court notes that the court of appeals in *American Federation of Unions* set out as follows:

> This court gives the term fiduciary a liberal construction in keeping with the remedial purpose of ERISA. *Donovan v. Mercer*, 747 F.2d 304, 309 (5th Cir. 1984). A person is a fiduciary only with respect to those portions of a plan over which he exercises discretionary authority or control. *Sommers Drug Stores Co. Employees Profit Sharing Trust v. Corrigan Enterprises, Inc.*, 793 F.2d 1456, 1459–60 (5th Cir.1986) *cert. denied*,

[479] U.S. [1034], 107 S.Ct. 884, 93 L.Ed.2d 837 (1987).

*Id.* at 662.

Continuing that court also stated:

[The defendant's] fiduciary status was not diminished by the trustees' final authority to grant or deny claims and approve investments. The term fiduciary includes those to whom *some* discretionary authority has been delegated. H.R.Conf.Rep. No. 1280, 93rd Cong., 2d Sess., *reprinted in,* 1974 U.S.Code Cong. & Admin.News 5038, 5103. (emphasis added)

*Id.* at 663.

■ It is not surprising that neither side of this controversy was able to furnish this Court with a case "on all fours" which could be dispositive as to Mr. Boswell's status. Finding one so situated as was Mr. Boswell, in today's business climate, is probably rare.

Having grown up with and even gone to kindergarten with Leo Seal, Jr.—the man whose name in this jurisdiction is synonymous with Hancock Bank—during the Bank's infancy, presented Boswell with great opportunity and obligation.

The exhibits and testimony before this Court presents a relationship which developed over decades to the point where Boswell enjoyed great freedoms and was accorded considerable deference because of his perceived knowledge in insurance and employee benefits.

Mr. Boswell was clearly more than a mere salesman and although he may have started out as such, he did his job so well that he became what he now would deny: a person upon whom the Plan Trustee, Administrator and beneficiary relied upon in allocating Plan assets.

While this Court agrees with the defendant that the phrase "to the extent" serves as a limitation on the fiduciary's status and liability in the appropriate case, such does not relieve Boswell of his duty.

Boswell is not being charged with lack of prudent advice with respect to investments of the Plan, as a whole. He is only being accused of mishandling a particular invest-

ment vehicle purchased in reliance upon his expertise.

It is therefore, this Court's holding that under this circuit's liberal construction of fiduciary, Boswell exercised sufficient discretionary authority or control, vis-a-vis the subject policies purchased and maintained by the Plan for Schloegel's account, to justify his being found to be a fiduciary.

### IV. *Did Boswell breach his fiduciary duty?*

The duties of a fiduciary as set out in 29 U.S.C. Section 1104(a)(1) are, in pertinent part, as follows:

Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;....

■ This Court finds from the record that notwithstanding his expressed feeling that Mr. Eastland was not willing to help him in such matters, Boswell could and should have obtained the necessary information regarding Plan contributions.

With the exception of the brief period in which one other employee was similarly insured, Boswell only had the responsibility of monitoring Schloegel's account and it seems undeniable that such information should have been forthcoming, had he requested it.

Interestingly, the defendant argues that the plaintiffs failed in their burden of proving that the purchase of the subject policies constituted a breach of fiduciary duty.

To the contrary, it is this Court's perception that the evidence supports a finding that:

1) the premiums were based upon an expectation that the Bank's contribution to the Plan would aggregate to an amount equal to no less than 15 percent of $60,000.00 at any time;

2) at no time during the period from 1977 to 1987 did the contributions to the Plan equal or exceed 15 percent;

3) Boswell never sought or obtained any information regarding contributions nor instructed Schloegel or persons authorized to act for him or the Plan to do so; and

4) although to this Court's knowledge the IRS has not pursued the matter, it is clear that violations of the 50% Rule could have resulted in the Plan being declared unqualified.

The defendant's erroneous and unfounded assumptions when relied upon by the plaintiffs should have been expected to result on a violation of the 50% Rule. Even if an initial good faith error could be found, Boswell's continued failure to ascertain and correct such error would clearly be contrary to the "prudent man" standard of ERISA.

### V. *Damages*

29 U.S.C. Section 1109(a) provides:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 111 of this title.

Although ERISA provides no method for calculating losses, this Court finds some measure of guidance in *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2nd Cir.1985), wherein it is stated:

One appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust. Restatement (Second) of Trusts Section 205(c) (1959); *see Eaves v. Penn*, 587 F.2d [453] at 463 [ (10th Cir.1978) ].

Continuing, the court stated:

In determining what the Plan would have earned had the funds been available for other Plan purposes, the district court should presume that funds would have been treated like other funds being invested during the same period in proper transactions. Where several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these. The burden of proving that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty. Any doubt or ambiguity should be resolved against them.... This is nothing more than application of the principal that, once a breach of trust is established, uncertainties in fixing damages will be resolved against the wrongdoer. *See Leigh v. Engle*, 727 F.2d [113] at 138 [ (7th Cir.1984) ]; *McMerty v. Herzog*, 710 F.2d. 429, 431 (8th Cir.1983).

*Id.*

The amount of damages in the sum of $61,300.00 (plus interest accrued on this sum since December 31, 1991) was calculated by using the actual effective rate of return paid to other Plan participants. The plaintiffs also ask for post judgment interest and costs. The plaintiffs' calculation "invested" the premiums in the year they were paid and credited the defendant with the cash value of each policy as returned.

The defendant's principal assertion is that the plaintiffs do not provide this Court with any method to compare life insurance with other Plan investments.

Specifically enumerating the elements of value of life insurance as (1) pure life insurance protection; (2) cash value buildup;

and (3) the right to pay a guaranteed, level premium, the defendant argues that only cash value was accounted for. The defendant also asserts that the plaintiffs bear the burden of quantifying the value of the third element which would require the expertise of an actuary.

Initially, this Court notes that elements (1) and (3) are losses, if any, which were suffered by the beneficiary and as stated by the United States Supreme Court in *Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134, 141, 105 S.Ct. 3085, 3090, 87 L.Ed.2d 96 (1985).

> A fair contextual reading of the statute makes it abundantly clear that its draftsmen were primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary.

If, however, the beneficiary's losses are to be considered, it is this Court's opinion that the burden of establishing the existence and value of mitigating factors is upon the breaching fiduciary. *See Donovan, supra.*

In conclusion, this Court finds that, based upon the facts and law, the defendant, Laurie Boswell, was a fiduciary of the Plan and as such, violated his duties under the "prudent man" standard of ERISA continuously from the purchase of the initial policy until said breach was discovered by the plaintiffs in 1987. This Court further finds that the plaintiffs' damages as calculated are in accord with accepted principles.

SO ORDERED AND ADJUDGED.