United States Court of Appeals,

Fifth Circuit.

No. 92-7592.

George A. SCHLOEGEL and the HANCOCK BANK PROFIT SHARING PLAN, Plaintiffs-Appellees,

v.

Laurie BOSWELL, Defendant-Third Party Plaintiff-Appellant,

v.

HANCOCK BANK, et al., Third Party Defendants-Appellees.

July 6, 1993.

Appeal from the United States District Court for the Southern District of Mississippi.

Before POLITZ, Chief Judge, REAVLEY and BARKSDALE, Circuit Judges.

REAVLEY, Circuit Judge:

The issue here is fiduciary relationship under the Employee Retirement Income Security Act (ERISA). The district court found Laurie C. Boswell to have been a plan fiduciary; we hold that he was not.

The Hancock Bank Profit Sharing Plan (Profit Sharing Plan) purchased two consecutive ordinary life insurance policies insuring the life of a plan participant, George A. Schloegel. Laurie C. Boswell procured the policies and received commissions on the premiums. The Profit Sharing Plan paid insurance premiums from 1977 to 1987, using funds from Schloegel's profit-sharing account. In 1987, the Profit Sharing Plan discovered that its payments of insurance premiums violated federal tax regulations requiring life insurance protection to be "incidental" to a qualified profit sharing plan. Faced with the possibility of losing its tax-deferred status as a profit sharing plan, the Profit Sharing Plan cancelled the insurance policy and placed the cash surrender value into Schloegel's profit-sharing account.

The Profit Sharing Plan and Schloegel (collectively the Plaintiffs) sued Boswell for breach of fiduciary duties imposed by ERISA. Although the Profit Sharing Plan has not lost its tax-deferred status, the Plaintiffs claim that they suffered a $63,300 loss due to the imprudent investment in life

insurance.  Following a bench trial, the district court entered judgment for the Plaintiffs.  800 F.Supp. 468.  We reverse on the ground that Boswell was not an ERISA fiduciary of the Profit Sharing Plan.

## I. BACKGROUND

Hancock Bank of Gulfport, Mississippi (the Bank) maintains an ERISA defined benefit pension plan (the Pension Plan) and the Profit Sharing Plan for its employees.  *See* 29 U.S.C. § 1002(2)(A).[1]  Although this lawsuit concerns only the investments of the Profit Sharing Plan, a discussion of the Pension Plan is necessary to explain Boswell's relationship with the Bank.

The Bank's own trust department serves as trustee for both the Pension Plan and the Profit Sharing Plan.  Charles L. Eastland, a trust officer within the Bank's trust department, has been responsible for performing the trustee functions for both plans since 1975.  Martha Peterman, the Bank's personnel director, has served as the plan administrator for both plans since 1979.

Before his retirement in 1990, Boswell was a pension and profit-sharing consultant and an insurance broker.  Although Boswell was never an employee of the Bank, he worked closely with the Bank from 1958 until the early 1980s as a consultant and an insurance broker.

A. Boswell's Consultations—Other Than Profit Sharing Plan

In 1958, Boswell assisted the Bank in establishing the Pension Plan.  He sold life insurance to the Pension Plan and received commissions on the premiums from 1963 to 1979.  Boswell regularly advised the Pension Plan until 1979, when the Pension Plan eliminated life insurance protection.

From 1975 to 1984, Boswell also regularly advised the Bank's Group Health Plan, which provided group term life insurance.  During this time, the Bank paid Boswell $200 per month as a retainer fee.  The parties dispute whether this retainer fee was exclusively for advising the Group Health Plan.  No written agreement exists describing the scope of Boswell's services.

From August 1980 to December 1982, the Bank paid Boswell an additional hourly consulting

---

[1]The Profit Sharing Plan is a "defined contribution plan," which means that the employee's benefits depend upon the amount the employer contributes to each participant's individual account.  *See* 29 U.S.C. § 1002(34).  By contrast, the Pension Plan is a "defined benefit pension plan," which means that the employee is entitled to a fixed periodic payment upon retirement.  *See* 29 U.S.C. § 1002(35).

fee. According to Boswell, this fee covered consulting work on the Bank's insurance matters unrelated to either the Pension Plan or the Group Health Plan. Pursuant to this arrangement, Boswell submitted to the Bank itemized statements of his services. Upon examining Boswell's itemized statements, we have found only a few charges that could possibly be attributed to the Profit Sharing Plan.

B. Boswell's Consultations—Profit Sharing Plan

The record demonstrates that Boswell had a much more limited role with respect to the Profit Sharing Plan than he did with respect to the Pension Plan and the Bank's Group Health Plan. At trial, Peterman, Eastland, and Schloegel testified that Boswell served as a consultant on all three benefit plans. But when questioned more closely, these three witnesses could identify only a few instances when Boswell advised the Profit Sharing Plan. The Plaintiffs' compilation of correspondence between Boswell and the Bank also fails to reveal a close relationship between Boswell and the Profit Sharing Plan. The parties dispute whether the Bank ever paid Boswell to advise the Profit Sharing Plan. The Plaintiffs contend that the $200 monthly retainer covered consultations on all plans, not just the Group Health Plan.

C. Profit Sharing Plan's Purchase of Life Insurance

In 1977, Leo Seal Jr., the Bank's chief executive officer and a close friend of Boswell, permitted Boswell to approach the Bank's senior executives with a proposal for them to use assets from their profit-sharing accounts to purchase life insurance. Boswell presented his proposal during a Bank management committee meeting to approximately six or seven senior executives, including Schloegel, who was then an executive vice president of the Bank. Neither the trustee nor the administrator of the Profit Sharing Plan attended this meeting. Boswell explained to the executives that purchasing life insurance through their individual profit-sharing account was a cheap way to buy life insurance since the premiums would be paid using before-tax dollars.

After the presentation, Schloegel expressed an interest in Boswell's recommendation and asked the Profit Sharing Plan to purchase life insurance for his individual profit-sharing account. Based upon Boswell's recommendation to Schloegel and Schloegel's interest, trustee Eastland made

the final decision to purchase the life insurance with funds from Schloegel's individual profit-sharing account. The Profit Sharing Plan purchased a New England Life Insurance Company (New England Life) policy on Schloegel's life, effective August 21, 1977. Boswell, as the procuring agent, received a commission from New England Life each year the Profit Sharing Plan paid the premiums. Eastland testified that he was unaware that Boswell was receiving commissions on the premiums paid by the Profit Sharing Plan. In addition to Schloegel, one other member of the management committee, Walter Hinkle, followed Boswell's life insurance advice. As with Schloegel, the Profit Sharing Plan purchased life insurance with funds from Hinkle's profit-sharing account. The Profit Sharing Plan cancelled the policy on Hinkle's life a few years later, but the record does not reveal why.

In 1980, Schloegel, Peterman, and Eastland began questioning the wisdom of purchasing life insurance with profit-sharing funds. Both Eastland and Peterman solicited advice from another insurance consultant, Robert W. Dowd, who advised them that purchasing ordinary life insurance in a profit sharing plan is advantageous to executives with life insurance needs.

Also in 1980, Peterman wrote Boswell, asking him to advise Schloegel on whether to cancel the New England Life policy. Schloegel personally wrote Boswell regarding his insurance needs in general, and inquired whether the New England Life policy was the best policy for him. In response to Schloegel's letter, Boswell recommended cancellation of the New England Life policy and purchase of a Massachusetts Mutual Life Insurance Company (Massachusetts Mutual) replacement policy, which had a lower premium.

Based on Schloegel's acceptance of Boswell's recommendation, trustee Eastland purchased the Massachusetts Mutual replacement policy with funds from Schloegel's profit-sharing account. As the procuring agent, Boswell received commissions from Massachusetts Mutual. The Profit Sharing Plan paid premiums through 1986. In 1987, Peterman and Eastland discovered that the Profit Sharing Plan's payment of Schloegel's premiums violated the federal tax regulation governing the amount of life insurance that a qualified profit sharing plan may purchase.

D. Violation of Federal Tax Regulations

Federal tax regulations permit a qualified profit sharing plan to provide death benefits to plan

participants as long as the death benefits are "incidental" to the primary purpose of providing retirement benefits (the incidental-death-benefit rule). Treas.Reg. § 1.401-1(b)(1)(ii). A profit sharing plan can satisfy the incidental-death-benefit rule if less than 50 percent of the employer's contributions (and forfeitures) allocated to the participant's profit-sharing account is used to purchase ordinary life insurance policies on the participant's life (the 50-percent test). *See* Rev.Rul. 74-307, 1974-2 C.B. 126; Rev.Rul. 54-51, 1954-1 CB 147, as modified by Rev.Rul. 57-213, 1957-1 CB 157.

In 1987, Peterman and Eastland analyzed Schloegel's profit sharing account and discovered that the Profit Sharing Plan's payments of the insurance premiums failed to meet the 50-percent test. Both Peterman and Eastland claim that, prior to their discovery, they were not concerned about violating the incidental-death-benefit rule because they relied on Boswell's expertise.

Once the violation was discovered, Peterman and Eastland feared that this violation would disqualify the entire Profit Sharing Plan from its tax-deferred status. In an attempt to rectify the problem, Eastland cancelled the Massachusetts Mutual policy and placed the cash surrender value into Schloegel's profit-sharing account. The Internal Revenue Service has not sought any tax deficiencies from any of the plan participants.

E. District Court Proceedings

Schloegel and the Profit Sharing Plan brought this lawsuit against Boswell, alleging breaches of fiduciary duties imposed by ERISA. The Plaintiffs claim that Boswell breached his ERISA fiduciary duties by recommending or inducing the Profit Sharing Plan to purchase the New England Life policy and the Massachusetts Mutual policy without first determining whether the 50-percent test could be met. The Plaintiffs further allege that Boswell breached his ERISA fiduciary duties by failing to subsequently advise the Profit Sharing Plan that its premium payments were not satisfying the 50-percent test.

On September 20, 1990, Boswell filed a third-party complaint and counterclaim, seeking contribution or indemnification from the Profit Sharing Plan, the Bank, Eastland, and Peterman.

In November 1990, the district court denied Boswell's 12(b)(6) motion to dismiss on statute of limitations grounds. 751 F.Supp. 642. In July 1991, the district court dismissed Boswell's

third-party action and counterclaim, holding that contribution and indemnification are not available under ERISA. 766 F.Supp. 563. The case proceeded to a bench trial. Following the trial, the district court entered judgment in favor of the Plaintiffs, awarding them $63,300.00 plus interest and costs. 800 F.Supp. 468.

## II. ANALYSIS

On appeal, Boswell argues, *inter alia,* that he was not an ERISA fiduciary of the Profit Sharing Plan.

ERISA imposes personal liability on "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon [ERISA] fiduciaries." 29 U.S.C. § 1109(a). A person is a "fiduciary" with respect to a plan

> to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

*Id.* § 1002(21)(A).

In holding that Boswell was a fiduciary, the district court noted that Boswell had become "a person upon whom the Plan Trustee, Administrator and beneficiary relied ... in allocating Plan assets." 800 F.Supp. at 474. The court concluded that "Boswell exercised sufficient discretionary authority or control, vis-a-vis the subject policies purchased and maintained by the Plan for Schloegel's account, to justify his being found to be a fiduciary." *Id.* Although not completely clear, it appears the district court relied only on subsection (i) of 29 U.S.C. 1002(21)(A) in determining that Boswell was a fiduciary.

On appeal, the Plaintiffs contend that Boswell qualifies as a fiduciary under subsections (i) and (ii).

### A. Subsection (i)—Authority or Control

The parties agree that trustee Eastland made the final decision to purchase the insurance policies on Schloegel's life. The Plaintiffs, however, contend that Boswell exercised effective control over the Profit Sharing Plan's investments by convincing it to purchase the policies. According to the

Plaintiffs, trustee Eastland relied upon Boswell's expertise and long-standing relationship with the Bank when he decided to invest Schloegel's funds in life insurance. The Plaintiffs' general theory of "effective" control has support from ERISA's legislative history:

> While the ordinary functions of consultants and advisers to employee benefit plans (other than investment advisers [which are covered in subsection (ii) of the applicable statutory definition] ) may not be considered as fiduciary functions, it must be recognized that there will be situations where such consultants and advisers may because of their special expertise, in effect, be exercising discretionary authority or control with respect to the management or administration of such plan or some authority or control regarding its assets. In such cases, they are to be regarded as having assumed fiduciary obligations within the meaning of the applicable definition.

H.R.Conf.Rep. No. 1280, 93d Cong., 2d Sess. 323, *reprinted in* 1974 U.S.Code Cong. & Admin.News 5038, 5103. The Seventh Circuit, in *Pappas v. Buck Consultants, Inc.,* 923 F.2d 531 (7th Cir.1991), recognized that this legislative history "seems to ... contemplate[ ] a ... fact-intensive inquiry that looks to whether the professional transcended her "ordinary functions.' " *Id.* at 537; *see also Mertens v. Hewitt Assoc.,* --- U.S. ----, ----, --- S.Ct. ----, ----, --- L.Ed.2d ---- 61 U.S.L.W. 4510, 4514 (1993) (noting that "[p]rofessional service providers such as actuaries become liable for damages when they cross the line from advisor to fiduciary."); 29 C.F.R. § 2509.75-5.

Mere influence over the trustee's investment decisions, however, is not effective control over plan assets. *See American Federation of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Soc'y,* 841 F.2d 658, 664 (5th Cir.1988) ("Simply urging the purchase of its products does not make an insurance company an ERISA fiduciary with respect to those products."); *Pappas,* 923 F.2d at 535 ("discretionary authority" and "discretionary control" refer to actual decision-making power, not the influence a professional may have over the decisions made by the plan trustees). To satisfy the "authority or control" element under subsection (i), the Plaintiffs must demonstrate that Boswell caused trustee Eastland to relinquish his independent discretion in investing the plan's funds and follow the course prescribed by Boswell. *See Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enter., Inc.,* 793 F.2d 1456, 1460 (5th Cir.1986), *cert. denied,* 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 837 (1987).

We rely on the following undisputed facts to conclude that Boswell did not have the degree of control necessary to satisfy the subsection (i) definition of fiduciary. First, trustee Eastland

testified that he has the duty to invest the plan's funds and that he made the ultimate decision to purchase the life insurance policies on Schloegel's life. Second, Eastland wrote to consultant Robert Dowd in 1980 to solicit his advice on whether to use profit-sharing funds to purchase life insurance. This indicates that Boswell was not usurping Eastland's investment power. Third, Boswell presented his life insurance proposal to six or seven members of the Bank's management committee, but Boswell only persuaded two of the members to accept his recommendation. These facts convince us that, as a matter of law, Boswell did not have the authority or control contemplated under subsection (i). *Compare Donovan v. Mercer,* 747 F.2d 304, 309 (5th Cir.1984) ("[A] person who is repeatedly referred to as a trustee of an employee benefit plan, and who signs documents and takes actions regarding the Plan in an official capacity, is, as a matter of law, a fiduciary....") *with American Federation of Unions,* 841 F.2d at 664 (merely proposing investments does not make an insurance company an ERISA fiduciary). Boswell made an investment *proposal,* not an investment decision.

B. Subsection (ii)—Investment Advice

The Department of Labor has adopted regulations explaining when a person is deemed to be providing "investment advice" under subsection (ii) of 29 U.S.C. § 1002(21)(A):

> A person shall be deemed to be rendering "investment advice" to an employee benefit plan, within the meaning of [29 U.S.C. § 1002(21)(A)(ii) ], only if:
>
> (i) Such person renders advice to the plan as to the value of securities or other property, or makes recommendation as to the advisability of investing in, purchasing, or selling securities or other property; *and*
>
> (ii) Such person either directly or indirectly ...
>
> (A) Has discretionary authority or control, whether or not pursuant to agreement, arrangement or understanding, with respect to purchasing or selling securities or other property for the plan; *or*
>
> (B) Renders any advice described in paragraph (c)(1)(i) of this section on a regular basis to the plan pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, that such services will serve as a primary basis for investment decisions with respect to plan assets, and that such person will render individualized investment advice to the plan based on the particular needs of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments.

29 C.F.R. § 2510.3-21(c)(1) (emphasis added) ("DOL Regulation"); *see also American Federation of Unions,* 841 F.2d at 664 & n. 5 (applying the DOL Regulation); *Farm King Supply, Inc.*

*Integrated Profit Sharing Plan & Trust v. Edward D. Jones & Co.,* 884 F.2d 288, 291-94 (7th Cir.1989) (same). The district court below did not discuss the DOL Regulation in ruling on Boswell's fiduciary status. *See* 800 F.Supp. at 473-74.

Boswell does not dispute that the first requirement of the DOL Regulation is met; he made recommendations as to the advisability of purchasing life insurance. *See* 29 C.F.R. § 2510.3-21(c)(1)(i).

The parties dispute whether the second requirement of the DOL Regulation is met. There are two ways to satisfy this second requirement. First, the second requirement is met if the person (Boswell) had "discretionary authority or control" with respect to purchasing property for the plan. *See id.* § 2510.3(c)(1)(ii)(A) ("Subpart (ii)(A)"). Subpart (ii)(A) of the DOL Regulation appears to overlap with subsection (i) of 29 U.S.C. § 1002(21)(A), which we discussed above. If a person has discretionary authority or control with respect to purchasing or selling securities or other property for the plan, that person would satisfy subsection (i) of 29 U.S.C. § 1002(21)(A) as well as satisfy Subpart (ii)(A) of the DOL Regulation. *See Olson v. E.F. Hutton & Co.,* 957 F.2d 622, 626 n. 4 (8th Cir.1992) (recognizing that Subpart (ii)(A) of the DOL Regulation overlaps with subsection (i) of the statutory definition).[2] For the reasons discussed above, we hold that Boswell did not have "discretionary authority or control" with respect to the Profit Sharing Plan's purchase of the insurance policies on Schloegel's life.

The second way of satisfying the second requirement of the DOL Regulation is by rendering investment-type advice on a regular basis to the plan pursuant to a mutual agreement, arrangement, or understanding between the advisor and the plan. That *mutual* agreement, arrangement, or understanding must indicate that such advice will serve as the primary basis for the plan's investment decisions and that the advisor will render individualized investment advice based on the plan's particular investment needs. *See* 29 C.F.R. 2510.3-21(c)(1)(ii)(B) ("Subpart (ii)(B)").

Boswell's relationship with the Profit Sharing Plan fails to satisfy Subpart (ii)(B). Despite

---

[2]We note that Subpart (ii)(A) of the DOL Regulation is *narrower* in scope than subsection (i) of 29 U.S.C. § 1002(21)(A). Subpart (ii)(A) of the DOL Regulation covers only discretionary authority or control with respect to purchasing or selling the plan's property.

Eastland's, Peterman's, and Schloegel's testimony that Boswell advised the Profit Sharing Plan, the record fails to show that Boswell rendered investment-type advice to the Profit Sharing Plan *on a regular basis.* Aside from the advice given in 1977 and 1980 regarding the life insurance for Schloegel and other executives, Eastland could only think of one other time when Boswell gave him investment advice. In searching through the record, we found only a few instances of Boswell providing investment-type advice to the Profit Sharing Plan. Furthermore, nothing in the record shows that the Profit Sharing Plan and Boswell had a mutual arrangement or understanding that Boswell's advice would serve as the primary basis for the plan's investment decisions. We noted earlier that only two members of the Bank's management committee followed Boswell's sale's pitch. The fact that Eastland solicited Dowd's advice on the advisability of purchasing life insurance further indicates that Eastland did not exclusively rely on Boswell's advice. Eastland testified at trial that he did not "seek [Boswell] out and ask advice" but that, if Boswell approached him, he "was willing to listen." This falls far short of the type of relationship described in the DOL Regulation.

Based on the DOL Regulation and the evidence at trial, we conclude, as a matter of law, that Boswell did not render "investment advice" for purposes of subsection (ii) of 29 U.S.C. § 1002(21)(A).

### III. CONCLUSION

Although Boswell worked closely with the Bank and its officers, a close examination of the relationship between Boswell and the Profit Sharing Plan reveals that Boswell was not a fiduciary of the Profit Sharing Plan. The judgment of the district court is reversed and judgment is here rendered in favor of Boswell.

REVERSED and RENDERED.