# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00868-CV

---

**Ryan Goyal, Appellant**

**v.**

**Henna Hora, Appellee**

---

### FROM THE 345TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-18-006215, THE HONORABLE JAN SOIFER, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Ryan Goyal appeals from a final decree of divorce from Henna Hora rendered after a bench trial. In two issues, Goyal complains of the district court's child-support order and characterization of the marital estate. We will affirm the district court's final decree of divorce.

## BACKGROUND

Goyal and Hora were married on October 23, 2016. They have one child, born November 1, 2017, who was one-and-a-half years old at the time of trial. Goyal is a licensed certified public accountant and was employed during the marriage as an auditor for Novogradac making over $11,000 monthly. Hora was not employed outside the home during the marriage. In April 2017, Goyal and Hora bought the house where they lived and raised their child until

their separation in October 2018. Hora filed for divorce in a Travis County district court later that month.

Before trial, the parties reached an agreement as to possession and access of the child. The primary disputes during trial concerned the amount of child support that Goyal should pay, Goyal's separate-property claims, and his claim for reimbursement. Both parties presented testimony from certified public accountants about the proper methodology for determining such claims. After the trial concluded on June 11, 2019, the district court granted the divorce subject to the division of the marital property in the final decree. On August 29, 2019, the district court signed a final decree of divorce dividing the marital estate and ordering Goyal to pay guideline child support on the first $8,550 of Goyal's monthly net resources plus an additional amount for the child's daycare, after-school care, extracurricular activities, and camp, the total amount of which was capped at $1,000.

The district court filed findings of fact and conclusions of law, including that "Goyal failed to carry his burden of proof regarding any separate property claim." Goyal filed objections to those findings and conclusions and requested additional or amended findings. As to its overall division of the marital property, the district court found that Goyal had greater earning capacity than Hora, that Hora would have benefited financially from the continuation of the marriage, that Goyal had business and trading opportunities not available to Hora, that Goyal had a more extensive educational background than Hora, that Goyal was at fault for the breakup of the marriage, and that Goyal had caused the expenditure of excessive attorneys' fees. This appeal followed.

**DISCUSSION**

Goyal complains of the district court's child-support order and its characterization of the marital estate. We review both these challenges to the final decree under an abuse-of-discretion standard. *See Rodriguez v. Rodriguez*, 860 S.W.2d 414, 415 (Tex. 1993) (addressing child support); *Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981) (addressing property division). A trial court abuses its discretion only if it acts arbitrarily, unreasonably, without regard to guiding legal principles, or without supporting evidence. *Gonzales v. Maggio*, 500 S.W.3d 656, 667 n.36 (Tex. App.—Austin 2016, no pet.); *Coburn v. Moreland*, 433 S.W.3d 809, 823 (Tex. App.—Austin 2014, no pet.).

Here, as in other family law cases, the abuse-of-discretion standard and traditional sufficiency standards of review overlap. *See Sink v. Sink*, 364 S.W.3d 340, 344 (Tex. App.—Dallas 2012, no pet.). In these cases, legal and factual insufficiency are not independent grounds of error but are relevant factors in assessing whether the trial court abused its discretion. *See Coburn*, 433 S.W.3d at 823; *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied). Thus, in determining whether the trial court abused its discretion, we consider whether the court had sufficient evidence upon which to exercise its discretion, and if so, whether it erred in the application of that discretion. *Coburn*, 433 S.W.3d at 823; *Zeifman*, 212 S.W.3d at 588.

Evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011). Evidence is legally insufficient when: (1) there is a complete absence of a vital fact; (2) rules of law or evidence preclude giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or

3

(4) the evidence conclusively establishes the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *Steele v. Steele*, No. 03-07-00011-CV, 2009 Tex. App. LEXIS 6519, at *8-9 (Tex. App.—Austin Aug. 19, 2009, no pet.) (mem. op.). When determining whether the evidence is legally sufficient to support the trial court's exercise of discretion, we consider the evidence in the light most favorable to the trial court's findings if a reasonable factfinder could, and disregard evidence to the contrary unless a reasonable factfinder could not. *Id.* at 827; *Steele*, 2009 Tex. App. LEXIS 6519, at *9. When determining whether the evidence is factually sufficient to support the trial court's exercise of discretion, we consider and weigh all the evidence presented and set aside the trial court's findings only if they are so contrary to the overwhelming weight of the evidence such that they are clearly wrong and unjust. *City of Keller*, 168 S.W.3d at 826. We review a trial court's findings of fact for legal and factual sufficiency under these same standards. *Robbins v. Robbins*, 550 S.W.3d 846, 854 (Tex. App.—Fort Worth 2018, no pet.). When the record contains some evidence of a substantive and probative character supporting the trial court's decision, there is no abuse of discretion. *Tran v. Nguyen*, 480 S.W.3d 119, 128 (Tex. App.—San Antonio 2015, no pet.); *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.).

**Child Support**

In his first issue, Goyal complains of the district court's order of child support "for a total of $2710.00, which includes guideline child support of $1710.00 and 'up to an additional $1000.00' more for daycare, after school care, extra-curricular activities and camp." Section 154.126 of the Family Code states that when an obligor's net monthly resources exceed

4

$8,550[1] a trial court may order additional amounts of child support to the presumptive-guideline amount:

> (a) If the obligor's net resources exceed the amount provided by Section 154.125(a) [$8,550], the court shall presumptively apply the percentage guidelines to the portion of the obligor's net resources that does not exceed that amount. Without further reference to the percentage recommended by these guidelines, the court may order additional amounts of child support as appropriate, depending on the income of the parties and the proven needs of the child.

> (b) The proper calculation of a child support order that exceeds the presumptive amount established for the portion of the obligor's net resources provided by Section 154.125(a) requires that the entire amount of the presumptive award be subtracted from the proven total needs of the child. After the presumptive award is subtracted, the court shall allocate between the parties the responsibility to meet the additional needs of the child according to the circumstances of the parties. However, in no event may the obligor be required to pay more child support than the greater of the presumptive amount or the amount equal to 100 percent of the proven needs of the child.

Tex. Fam. Code § 154.126. A child-support award exceeding the presumptive award must be based only on the child's unmet needs. *Rodriguez*, 860 S.W.2d at 417-18. A child's needs are not limited to "the bare necessities of life." *Id.* at 417 n.3. Rather, the trial court must determine, in its discretion, what the child's needs are on a case-by-case basis by following the "paramount guiding principle: *the best interest of the child*." *Id.* (emphasis in original); *see Iliff v. Iliff*, 339 S.W.3d 74, 81 (Tex. 2011) (quoting *Rodriguez*, 860 S.W.2d at 417 n.3). A trial court sitting as the trier of fact is the sole judge of the credibility of the witnesses and the weight assigned their

---

[1] Under the guidelines effective September 1, 2013, the amount of the net-resources cap appliable here is $8,550. *See* 38 Tex. Reg. 4647, 4647 (July 19, 2013) (Office of the Att'y Gen., Announcement of Adjustment Required by Texas Family Code § 154.125); *see also* Tex. Fam. Code § 154.125 (note stating that "The Texas Attorney General's Office adjusted the net-resources cap in subsection (a) and referred to in subsection (a-1) to $8,550.00, per the Office of the Attorney General 2013 Revised Tax Charts, effective September 1, 2013."). The net-resources cap increased to $9,200 effective September 1, 2019. *See* 44 Tex. Reg. 3559, 3559 (July 12, 2019).

testimony, and the court may accept or reject all or any part of the testimony of each witness. *In re Marriage of Skarda*, 345 S.W.3d 665, 672 (Tex. App.—Amarillo 2011, no pet.).

Here, the child-support order in the final divorce decree states that Goyal's net resources per month "are in excess of $8,550," that Hora's net resources are $0, and that the percentage applied to the first $8,550 of Goyal's net resources for child support is 20 percent. *See* Tex. Fam. Code §§ 154.125(b) (providing chart of child-support guidelines setting support for one child at twenty percent of obligor's net resources); .126(a) (directing trial court to "presumptively apply the percentage guidelines to the portion of the obligor's net resources that does not exceed that amount"); .130 (governing findings in child support order). Thus, the district court correctly determined that the presumptive guideline amount—twenty percent of Goyal's $8,550 net monthly income—is $1,710. Additionally, the decree ordered Goyal to pay, up to a maximum of $1,000 per month, the cost of the child's daycare, after-school care, camp, and/or other extracurricular activities.

Goyal contends that the district court abused its discretion by ordering child support exceeding the presumptive guideline amount because there was legally or factually insufficient evidence of net resources and the proven needs of the child to support that award. A party who challenges the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof must demonstrate that there is no evidence to support the adverse finding. *Exxon*, 348 S.W.3d at 215. "A party who challenges the factual sufficiency of an adverse finding on an issue on which he did not have the burden of proof must demonstrate that the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). It was undisputed during trial that Goyal's net monthly income exceeds $8,550. Goyal testified that he makes about

6

$11,000 per month, and his proposed support decision filed with the district court specified that his "gross money earned per month" is $11,666.68. Additionally, Goyal agreed during trial that he is "at cap child support."

Hora testified about the needs of the child, including $1,200 per month for daycare and approximately $125 per month for expenses of periodic activities such as going to indoor playgrounds, the zoo, outdoor parks, theme parks, and play dates with other children. Hora also testified that she was not making any money and that she needed about $5,700 per month for both her and the child's expenses combined, as reflected in her itemized "First Amended Proposed Support Decision," which was admitted into evidence without objection. *See Yarbrough v. Yarbrough*, 151 S.W.3d 687, 693 (Tex. App.—Waco 2004, no pet.) (concluding that trial court had sufficient information, based on mother's testimony and list of monthly expenses, from which it could make fair determination of pertinent expenses justifying child-support order); *Scott v. Younts*, 926 S.W.2d 415, 421 (Tex. App.—Corpus Christi 1996, writ denied) ("The child's mother is in the best position, as managing conservator, to explain the needs of the child."). Further, Hora stated that Goyal exercised only about half of his visits before the temporary-orders hearing, and only about two percent of his allotted possession time after that hearing.

As to daycare, Goyal testified that it was in the child's best interest to stay at the daycare that he was attending. And when asked on cross-examination whether he should have to pay for half, all, or none of the child's daycare in addition to child support, Goyal responded, "At this point, because we were never able to settle, I'm leaving all—anything related to property to the judge."

7

In addition to the child-support findings in its decree, the district court's findings of fact expressly state that Goyal's net income exceeded $8,550 per month and that "[t]he proven needs of the child include the need for daycare, after-school care, camp and/or other extracurricular activities." The district court's findings of fact also state that Goyal "historically did not exercise all of his periods of possession" and "is likely to not exercise all his periods of possession in the future, thus increasing the need for support." These factors—the needs of the child, the ability of the parents to contribute to the support of the child, the amount of time of possession of and access to a child, and child-care expenses incurred by either party in order to maintain gainful employment—are set forth in the Family Code as relevant considerations when a trial court is determining whether the amount of child support set forth by the guidelines should be increased or decreased. *See* Tex. Fam. Code § 154.123(b)(1), (2), (4), (6); *see also In re Gonzalez*, 993 S.W.2d 147, 155 (Tex. App.—San Antonio 1999, no pet.) (concluding that court's findings sufficiently informed father where to direct his evidentiary challenges and that reasons stated by trial court were adequate to satisfy section 154.130); *Zajac v. Penkava*, 924 S.W.2d 405, 410 (Tex. App.—San Antonio 1996, no pet.) (holding that substantial compliance with statutory predecessor to section 154.130 was sufficient); *cf. In re K.F.*, No. 02-18-00187-CV, 2018 Tex. App. LEXIS 10853, at *13 (Tex. App.—Fort Worth Dec. 27, 2018, pet. denied) (mem. op.) (noting that mother's claim of $9,150 for "necessary current monthly living expenses for the Children," without further explanation for those expenses, was actually tied to mother's lifestyle change associated with new marriage and upgraded housing, which were insufficient to permit child-support award above statutory guidelines). Moreover, this list of statutory factors is not exhaustive, and the trial court must consider all relevant factors. *See Sanchez v. Sanchez*, 915 S.W.2d 99, 103 (Tex. App.—San Antonio 1996, no writ); *see also* Tex. Fam. Code

8

§ 154.123(b)(17) (providing that trial court "shall consider," in addition to other listed factors, "any other reason consistent with the best interest of the child, taking into consideration the circumstances of the parents").

We conclude from this record that the district court had legally and factually sufficient evidence on which to exercise its discretion when making its child-support order and that it did not err in the application of that discretion. *See Coburn*, 433 S.W.3d at 823; *Zeifman*, 212 S.W.3d at 588. Because the evidence in this record is legally and factually sufficient to support the district court's judgment, we overrule Goyal's first issue.

**Characterization of Marital Estate**

In his second issue, Goyal complains of the district court's characterization of the marital estate as consisting only of community property. Goyal contends that the district court should have recognized his separate-property interests in a Charles Schwab "Schwab One" brokerage account x8922, three Vanguard retirement accounts (consisting of a rollover IRA brokerage and two Roth IRA brokerage accounts), three Novogradac & Company LLP retirement accounts (consisting of 401(k), employer-profit-sharing, and Roth 401(k) deferral accounts), a Charles Schwab "High Yield Investor Checking" account x1150, and a KBS "Strategic Opportunity REIT" (real estate investment trust) account. Goyal also contends that the district court should have allowed his claim for reimbursement of a down payment on the marital home.

To place Goyal's second issue in proper context, we summarize some general principles concerning awards of marital property during divorce. In a divorce decree, a trial court must divide the community estate in a manner that the court deems "just and right," with

9

due regard for each party's rights. Tex. Fam. Code § 7.001; *Pearson v. Fillingim*, 332 S.W.3d 361, 363 (Tex. 2011) (clarifying that trial courts can divide only community property). Community property is the property, other than separate property, acquired by either spouse during marriage. Tex. Fam. Code § 3.002. Separate property is the property owned or claimed by the spouse before marriage, as well as property that the spouse acquired during marriage by gift, devise, or descent. Tex. Const. art. XVI, § 15; Tex. Fam. Code § 3.001.

Property possessed by either spouse during or on dissolution of marriage is presumed to be community property. Tex. Fam. Code § 3.003(a). Whether the property is separate or community property is determined by the facts that, according to rules of law, give character to the property. *Raymond v. Raymond*, 190 S.W.3d 77, 80 (Tex. App.—Houston [1st Dist.] 2005, no pet.). Separate property can retain its character through a series of exchanges if the party asserting separate ownership overcomes the community-property presumption by tracing the assets on hand during the marriage back to property that, because of its time and manner of acquisition, is separate in character. *Sink*, 364 S.W.3d at 345.

"Parties claiming certain property as their separate property have the burden of rebutting the presumption of community property." *Pearson*, 332 S.W.3d at 363. Meeting this burden requires tracing and clearly identifying the property in question as separate by clear and convincing evidence. *Id.*; *see* Tex. Fam. Code § 3.003(b) ("The degree of proof necessary to establish that property is separate property is clear and convincing evidence."). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *Ganesan v. Vallabhaneni*, 96 S.W.3d 345, 354 (Tex. App.—Austin 2002, pet. denied).

When, as here, the burden of proof at trial is by clear and convincing evidence, we apply higher standards of review for legal and factual sufficiency. *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002); *Zagorski v. Zagorski*, 116 S.W.3d 309, 314 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). When reviewing the legal sufficiency of the evidence under this higher standard, we consider the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d at 265-66; *Zagorski*, 116 S.W.3d at 314. We must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *In re J.F.C.*, 96 S.W.3d at 266. When reviewing the factual sufficiency of the evidence under this higher standard, we consider whether all of the evidence is such that a fact finder could reasonably form a firm belief or conviction that the assertion of separate property was proven. *See In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d 17, 25-26 (Tex. 2002); *Stavinoha v. Stavinoha*, 126 S.W.3d 604, 609 (Tex. App.—Houston [14th Dist.] 2004, no pet.). We consider whether disputed evidence is such that a reasonable fact finder could not have resolved that disputed evidence in favor of its finding. *See In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d at 25; *Stavinoha*, 126 S.W.3d at 609. Even under this heightened standard of review, a factual sufficiency issue requires us to consider all the evidence in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Zagorski*, 116 S.W.3d at 314.

An asset may be properly deemed community property when a spouse fails to rebut the Family Code's community-property presumption. *See Pearson*, 332 S.W.3d at 364. When this occurs, it "is not a divestiture of separate property, but a necessary classification of property as set by the community presumption." *Id.* "Mere testimony that property was

11

purchased with separate funds, without tracing of the funds, is generally insufficient to rebut the [community property] presumption." *McElwee v. McElwee*, 911 S.W.2d 182, 188 (Tex. App.—Houston [1st Dist.] 1995, writ denied); *see Ganesan*, 96 S.W.3d at 354 (concluding that husband had failed to overcome community-property presumption as to certain retirement and brokerage accounts because neither his testimony nor his exhibits provided "statements of accounts, dates of transfers, amounts transferred in or out, sources of funds, or any semblance of asset tracing"). Similarly, when the evidence shows that separate and community property have been so commingled as to defy resegregation and identification, the community-property presumption prevails. *See McKinley v. McKinley*, 496 S.W.2d 540, 543 (Tex. 1973); *Rivera v. Hernandez*, 441 S.W.3d 413, 423 (Tex. App.—El Paso 2014, pet. denied) (noting that party may plead that brokerage account is separate property, "but income earned and dividends paid—if not clearly traced—will result in characterization of the account as community property due to commingling"). We resolve any doubt as to the character of property in favor of community status. *See Sink*, 364 S.W.3d at 345; *Willett v. Rodriguez*, No. 03-16-00084-CV, 2017 Tex. App. LEXIS 5096, *4 (Tex. App.—Austin June 2, 2017, pet. denied) (mem. op.).

To support his separate-property claims in this case, Goyal presented testimony from Michael Scott Turner, a certified public accountant with approximately twenty years of experience and certified in financial forensics, who is also a real estate broker. Arguing that there were problems with Turner's methodology, Hora presented testimony from Steve D. Peña, a certified public accountant with approximately forty-five years of experience who has specialized in forensic accounting for over thirty years. Turner and Peña provided the district court with reports summarizing their testimony.

12

Before discussing his separate-property claims in this appeal, Goyal faults Peña for "not rebut[ting] the evidence." However, as we have noted, Goyal bore the burden of proof at trial on the separate-property characterization issue, not Hora. *See Pearson*, 332 S.W.3d at 363. Thus, as Hora correctly states, Peña was not responsible for tracing a separate-property interest. Further, Hora notes that Turner's opinions were fundamentally problematic. For instance, he testified that his opinions about Goyal's separate property were based on a "more likely than not" standard, rather than the proper clear-and-convincing standard:

Q. Mr. Goyal has the burden to prove his separate property. Is that your understanding?

A. Yes.

Q. And the burden for that is what?

A. The origin—the origin of the funds and the change or any type of—what's the word?—change in character.

Q. Well, when you traced and you gave opinions about separate property, what opinion did—what burden of proof did you attribute to coming up with your opinion of what was Mr. Goyal's separate property?

A. Based on if there was any community property that was put in that was commingled.

Q. And did you do this by a preponderance of the evidence; in other words, more likely than not that—

A. Yes.

Q. And that's the standard that you use, correct?

A. Yes. Uh-huh.

. . . .

Q. Did you use . . . the standard that it's more likely than not when you came up with the opinion that this is Mr. Goyal's separate property?

13

A. I used what I considered to be accurate.

Additionally, Turner prefaced opinions in his report about tracing the various accounts by incorrectly referring to "tracing community property funds." His report states, "In some cases, once a financial institution account is established as Separate Property, the responsibility for tracing Community Property funds becomes the responsibility of the opposing party. Community Property is no longer assumed as the character of the funds." *Cf. Sink*, 364 S.W.3d at 344 (noting that concept of tracing involves establishing *separate* origin of property). On cross-examination, Turner stood by this portion of his report, which he said represented "what [his] understanding was from some of [his] courses."

Because disputes about tracing methodology are the primary focus of Goyal's second issue, we consider the evidence as to the characterization of these accounts before addressing the reimbursement claim.

### 1. Charles Schwab "Schwab One" brokerage account x8922

Turner stated that this account was part of the separate property brokerage account "with the banking and margin-trading features" that Goyal had opened before marriage. "Margin trading uses borrowed money to invest with and has 'long been perceived to have special risks,' including the risk of losing more funds than have been deposited in the margin account." *Song v. Sung Uh Kang*, No. 02-18-00375-CV, 2020 Tex. App. LEXIS 3008, at *2 n.2 (Tex. App.—Fort Worth Apr. 9, 2020, pet. denied) (mem. op.) (quoting 2 *Bromberg & Lowenfels on Securities Fraud* § 5:286 (2d ed.)). Goyal testified that the balance in the x8922 account was 100% his separate property. He acknowledged having been an active trader at times and testified that the account was "self-managed," meaning that he directed the account's

14

investments, rather than having a broker invest for him. Problems with tracing this account included the lack of information about the stock in the account when the parties married and when they divorced and a three-month gap in the monthly activity statements. There was also a dispute about the margin loan, summarized in this exchange during Turner's cross-examination:

> Q. So if I'm going to boil down kind of overall our differences, on 8922 our difference is the margin loan: Is it community or is it separate; and everything kind of falls from there. Fair?
>
> A. Correct.

### a. Stock in account at marriage and at divorce

An initial problem with tracing this asset was that Turner could not identify what stock existed in the account at the time of the divorce:

> Q. Now, back to—did you review all the—just talking broadly before we go into more detail, did you review the—all the statements for 8922, the Charles Schwab 8922 account?
>
> A. Is that the—that was the brokerage account.
>
> Q. Right.
>
> A. Yes. Okay. Your question again? I'm sorry.
>
> Q. Did you review those?
>
> A. Yes, I did.
>
> Q. Now, as you sit here right now, what stocks were—are in that account right now?
>
> A. I can't tell you what's in there right now.

15

Additionally, Turner was unable to identify whether the stock that existed in the x8922 brokerage account when Goyal and Hora married was still in that account:

> Q. Now, under your deal, if I take—if I have a thousand dollars in community income and I purchase stock with it and that stock goes through the roof, that's—increase in value is community, correct?
>
> A. That's correct. Uh-huh.
>
> Q. And so, for example, in this case—well, on the brokerage account—the 8922 brokerage account, it's composed of stock, correct?
>
> A. Yes, uh-huh.
>
> Q. It's not a cash account. There's actual stocks in there, correct?
>
> A. Correct, uh-huh.
>
> Q. So when you talk about Mr. Goyal owning a brokerage account, he actually owns stock within that brokerage account, correct?
>
> A. Well, yes. That's—that's correct. Uh-huh.
>
> Q. And you can't tell us which stock—all the stock that is in his brokerage account is purchased during the marriage, correct?
>
> A. No. He had stock that was in the account before the marriage.
>
> Q. And does that stock still exist?
>
> A. I'd have to go look through every single stock transaction, but I don't know.

Turner's analysis, which lacks that specific information, does not trace the origin of the stock in the x8922 brokerage account at the time of divorce. Because the stock in x8922 at the time of the parties' divorce was not owned by Goyal before the marriage, it was Goyal's burden to show through tracing that the stock in existence at the time of the divorce was acquired in exchange for separate property. *See Sink*, 364 S.W.3d at 344-45 (noting that separate property can retain its

16

character through series of exchanges if party asserting separate ownership overcomes community-property presumption by tracing assets on hand during marriage back to property that, because of its time and manner of acquisition, is separate in character); *Ridgell v. Ridgell*, 960 S.W.2d 144, 148 (Tex. App.—Corpus Christi 1997, no pet.) ("Property acquired in exchange for separate property becomes the separate property of the spouse who exchanged the property."); *see also Gaides v. Gaides*, No. 14-99-00172-CV, 2001 Tex. App. LEXIS 2930, at *18-19 (Tex. App.—Houston [14th Dist.] May 3, 2001, pet. denied) (not designated for publication) (concluding that spouse, who claimed that certain shares of stock in "actively traded" Dean Witter '508 brokerage account were her separate property, failed to meet her burden of tracing various mutations within that commingled account). Goyal did not trace that stock, and without doing so, there is not clear and convincing evidence of Goyal's separate property claim to x8922 account assets.

### b. Gap in monthly activity account statements

Moreover, Turner acknowledged that the x8922 brokerage account, which had millions of dollars of transactions in just a matter of months, had a three-month gap in documentation during the time of its greatest gain, meaning that Turner was unable to see the monthly activity for those two or three months:

Q. Now, in this 8922 account, you'll agree with me—you've looked through all the statements, correct?

A. Uh-huh, yes.

Q. And you'll agree with me there was a lot of trading that goes on in that account, correct?

A. Yes, uh-huh.

17

Q. It's—Mr. Goyal actively trades. Is that fair to say?

A. Well, do you want to define a time period?

Q. Sure. Starting in around June of 2017, the account really picks up on activity and has active trading in it, correct?

A. That's correct. There wasn't hardly any to start with.

Q. And we're talking about millions of dollars in transactions over—in—in months—just a few months, correct?

A. Yes, uh-huh.

. . . .

Q. Did you notice, by the way, that there's a big leap between January 2018 and April of 2018 from just north of 375 to—I'm sorry, just south of 375 to just south of 750? Did you notice that huge leap between January and April?

A. Yes, I see that. Uh-huh.

Q. And did you notice that Mr. Goyal produced monthly statements for the entire account but skips those months?

A. Yes, I was aware of that.

Q. When were you aware of that?

A. Well, months ago.

. . . .

Q. Can you—so maybe a better question is: Can you show me anywhere in here that there's a gap where we have zero information for an account other than this gap between January 2018 and April 2018 when the account almost doubles in value?

A. I don't believe there's any other gap.

Gaps in account statements can make tracing evidence less than "clear and convincing." *See In re Everse*, 440 S.W.3d 749, 752 (Tex. App.—Amarillo 2013, no pet.) (noting that tracing

18

evidence included gap between account statements for November 1999 and September 2010 and concluding that trial court did not err by finding husband's tracing evidence "to be less than the clear and convincing evidence required"). We conclude that this three-month gap in monthly account statements, particularly during the period of the brokerage account's extraordinary growth, renders the evidence of Goyal's separate property claim to the x8922 account assets less than clear and convincing. *See id.*

### c. Margin loan

The rest of the x8922 account statements show that the millions of dollars in trades in this "self-managed" account were traded on margin debt that was incurred during the marriage. Goyal testified that his use of the margin was neither a "loan" nor a "debt," but that is contrary to the testimony of his own expert, who acknowledged that the margin balance reflected on statements in evidence was for money that Goyal borrowed during the marriage. Additionally, Turner testified on cross-examination that the trading in the account that led to an increase of almost $400,000 in three months was done on the margin:

> Q. If you look at the margin loan balance, the margin loan balance in May of 2017 was zero, correct?
>
> A. Yes, correct.
>
> Q. And this is right before the time that you and I just talked about that Mr. Goyal started actively trading, correct?
>
> A. Correct.
>
> Q. And then if you go to the next month, which is June of 2017, if you look on Page 4 of that month's statement, the margin loan balance goes up to 200,000, correct?
>
> A. Yeah, approximately.

Q. And that's money that Mr. Goyal borrowed during the marriage, correct?

A. Correct.

Q. And that $200,000 that Mr. Goyal borrowed during the marriage was used to fund the trading that took place in that account in June of 2017, correct?

A. Correct.

Q. And starting in June 2017, that's when we start seeing active trading in the account, correct?

A. That's correct.

Q. By the way, June of 2017 is when you start seeing Mr. Goyal purchase the stock called Nutanix, correct?

A. Correct.

Q. That he used—that he purchased all these transactions being funded by the margin loan that was taken out during the marriage, correct?

A. Correct.

Turner acknowledged that he was unable to identify what trading was funded by margin loan during the marriage and what was funded by stock that Goyal owned before the marriage:

Q. And, again, that's stock performance. That's not Mr. Goyal dumping income into it. It's certainly not dividends and interest, correct?

A. Correct.

Q. And that's stock performance funded by the margin loan balance, correct?

A. That's correct.

Q. And you see—

A. Well, it—excuse me. Let me clarify. It's margin and the original stock equity, because you can only go up to 50 percent.

20

Q. And you don't know—but you don't know, as far as—you can't differentiate between—for us what was funded by the margin loan balance and what was funded by stock that Mr. Goyal owned, correct?

A. No. That's correct. It's—it's totally immersed.

Q. Commingled.

A. Yeah, commingled. Uh-huh.

After reviewing Turner's methodology, Peña testified that what Turner had done for the x8922 account was not a "trace" at all:

Q. For the 8922, what Mr. Turner did on that account is not a trace and not a methodology that's accepted.

A. That is my opinion. Yes, sir.
 . . . .

Q And to the extent, even if it was a methodology, this margin loan is community, and that's what funded all the trading in there. Is that your opinion?

A. It—it funded—it funded had a great deal of training—trading.

Q. But we don't have to get to that step because there's no methodology to begin with; fair?

A. There was no trace made.

Q. For 8922, right?

A. Correct.

Turner testified that the margin loan account—from which Goyal borrowed during the marriage—was separate because it was opened before the marriage. But Turner acknowledged that if he was incorrect in his conclusion that the margin loan was separate, then his "trace" of the x8922 account is ineffective:

Q. And just to be clear, I think—to make sure you and I are on the same page, so to kind of narrow and simplify the issues, if the margin loan balance—if the margin loan is separate, your trace—you say your trace works, correct?
A. Correct. Yes.

Q. If the margin loan is community, then it doesn't work, correct?

A. That's correct.

. . . .

Q. Well, if an account is—if an account is so commingled to where it cannot be traced, the case law is that the account is all presumed to be community, correct?

A. My understanding is that it's—if it's the community property and the separate property are commingled.

Q. Right.

A. But my contention is that the margin was—remained separate because of the original date of inception of the agreement for—open the account.

Turner's opinion that the margin "remained separate" based on the date that the account was opened is contrary to Texas law on the characterization of property. Unless a creditor agrees to look only to separate property for repayment, anything acquired by either spouse on credit during marriage is characterized as community property, and the critical time period for characterization purposes is when the loan is secured:

[T]he status of the property is to be determined at the time when the loan is secured. It will not do to say, because perchance the separate property of the husband, or the wife, as the case may be, which has been used as security, may have to be resorted to for the purpose of paying the debt in whole or in part, that therefore the money secured by the loan, and the merchandise purchased with it, constitutes a portion of the separate property of the marital partner whose property had been used as security.

22

*Heidenheimer Bros. v. McKeen*, 63 Tex. 229, 230 (Tex. 1885); *see* James W. Paulsen, *Acquiring Separate Property on Credit: A Review and Proposed Revision of Texas Marital Property Doctrine*, 37 St. Mary's L. J. 675, 676 (2006) (stating "apparent black letter rule" that "anything acquired by either spouse on credit during marriage is community property, unless the creditor agrees at the outset to look only to separate property for repayment," or put differently, "all property acquired on credit during marriage is community property, unless that property is acquired by a separate-property-secured non-recourse loan").  Similarly, the court in *Jones v. Jones* stated:

> It is well established that debts contracted during marriage are presumed to be on the credit of the community and thus are joint community obligations, unless it is shown that the creditor agreed to look solely to the separate estate of the contracting spouse.  Likewise, property purchased on credit during a marriage is community property unless there exists an express agreement on the part of the lender to look solely to the separate estate of the purchasing spouse for satisfaction of the indebtedness.

890 S.W.2d 471, 475 (Tex. App.—Corpus Christi 1994, writ denied) (internal citations omitted); *see Tedder v. Gardner Aldrich, LLP*, 421 S.W.3d 651, 655 (Tex. 2013) (clarifying that "community debt" means only "that some community property is liable for its satisfaction").

The evidence in this record is unlike that in *Carter v. Carter*, where a husband met his clear-and-convincing burden of proof by well-documented tracing of separate property through various investment mutations.  *Cf.* 736 S.W.2d 775, 777-78 (Tex. App.—Houston [14th Dist.] 1987, no writ) (concluding that assets from sale of shares of Stouffer stock were husband's separate property because they were traced back to gift of MPI stock that husband received from his father; evidence showed that husband had received 159 shares of MPI stock as gift, MPI stock had converted to 4,645 shares of Stauffer stock when MPI was bought by Stauffer, Stauffer

stock had two-for-one split doubling his shares to 9,290, and husband had opened margin account through which he "bought and sold stock on credit" using some 6,134 shares of his remaining Stauffer stock as collateral for debt created within account). This case is also distinct from *Holloway v. Holloway*, where the husband established that a bank agreed to look solely to his separate property for repayment of loan made to him and that the husband purchased stock in a pipeline with the proceeds of this loan. *Cf.* 671 S.W.2d 51, 57 (Tex. App.—Dallas 1983, writ dism'd) (noting that evidence included: (1) promissory note and security agreement from husband to bank, signed "Pat S. Holloway, Separate Property"; (2) bank form, also signed, "Pat S. Holloway, Separate Property," reciting that purpose of loan was "equity in pipeline venture"; and (3) husband's affidavit stating that securities listed as collateral in security agreement were acquired before his marriage and that husband intended bank to rely on his affidavit in "making the loan for his separate account to be secured by the securities listed and in order to induce the bank to make a loan to him for which the community estate shall not be liable"). This case is similar to *Merrell v. Merrell*, in which the court determined that a husband had failed to trace his separate property back to an inheritance of stocks from his mother. *See* 527 S.W.2d 250, 255 (Tex. Civ. App.—Tyler 1975, writ ref'd n.r.e.) (affirming trial court's finding of community property). In *Merrell*, the husband testified that he had sold some of his inherited stocks worth about $100,000 and that he had used those funds to finance the purchase of duplexes. *Id.* However, the evidence also showed that the husband had "many stock and bond transactions during the marriage," he had "bought and sold many shares of stock and some were bought short or on margin," "bonds were also bought on margin," and at times "he would owe his brokerage firm several thousand dollars, and at other times he would have a credit with them." *Id.* Given that evidence, the court held that it was "unable to conclude that such funds were properly traced

24

as [husband]'s separate property and not commingled with [wife]'s separate property or the community property." *Id.*

Here, we conclude that in the absence of clear and convincing evidence from Goyal establishing the separate-property interest in the Schwab One x8922, the statutory community-property presumption prevails. *See Pearson*, 332 S.W.3d at 364; *see* Tex. Fam. Code § 3.003(b). Thus, the record supports the district court's finding that Goyal failed to carry his burden of proof as to this separate-property claim.

### 2. Retirement accounts

The next assets we consider are Goyal's multiple retirement accounts. Retirement plans are commonly classified as defined-contribution plans or defined-benefit plans. *See Reiss v. Reiss*, 118 S.W.3d 439, 440 n.1 (Tex. 2003) (citing *Shanks v. Treadway*, 110 S.W.3d 444, 445 (Tex. 2003)). A "defined contribution" plan is one in which the employee's benefits depend on the amount that an employer contributes to each participant's individual account. *Schloegel v. Boswell*, 994 F.2d 266, 268 n.1 (5th Cir. 1993); *see* 29 U.S.C. § 1002(34); *Shanks*, 110 S.W.3d at 444 n.1. By contrast, a "defined benefit" plan is one in which an employee is entitled to a fixed periodic payment upon retirement. *Schloegel*, 994 F.2d at 268 n.1; *see* 29 U.S.C. § 1002(35); *Shanks*, 110 S.W.3d at 444 n.1. The IRA, 401(k), and profit-sharing plans here, as Goyal notes, are "defined-contribution" plans. *See Schloegel*, 994 F.2d at 268 n.1; *see* 29 U.S.C. § 1002(35).

"[C]ontributions with earned income to 401(k)s and retirement plans during marriage are community property." *Leax v. Leax*, 305 S.W.3d 22, 33 (Tex. App.—Houston [1st Dist.] 2009, no pet.). Subsection 7.001(c) of the Texas Family Code specifies that "[t]he separate property interest of a spouse in a defined contribution plan may be traced using the tracing and characterization principles that apply to a nonretirement asset." Tex. Fam. Code

§ 7.001(c). By enacting this statute, the Legislature rejected earlier cases relying on the account balance as of the date of marriage to determine a separate-property interest:

> Subsection (c) [of Family Code section 3.007] allows for internal tracing within defined contribution plans. Given the overwhelming preference for such retirement plans, often self-directed by the employee, it is only logical that internal tracing be allowed. This subsection is a legislative overturning of the "opening balance" theory cases holding that the separate property interest is the account balance on the day of marriage and the community interest is everything else. *See, e.g. Pelzig v. Berkebile*, 931 S.W.2d 398 (Tex. App.—Corpus Christi 1996, no writ); *Hatteberg v. Hatteberg*, 933 S.W.2d 522 (Tex. App.—Houston [1st Dist.] 1994, no writ). This does not mean that internal tracing will always be easy as often the funds are in mutual funds or similar investments making it more difficult to differentiate between the market appreciation of assets and growth from dividends and interest.

John J. Sampson, et al., *Sampson, Tindall, & England's Texas Family Code Annotated* § 3.007 cmt. (2020).

### a. Vanguard retirement accounts

Turner characterized all the Vanguard retirement accounts—Vanguard IRA Rollover Brokerage xx1471, Vanguard Roth IRA Brokerage xx7312, and Vanguard Roth IRA Brokerage xx8095—as "separate property account[s] created prior to the marriage." Turner did not perform the tracing set forth in subsection 7.001(c) to determine the separate-property interest in these accounts, although he acknowledged that it was possible to perform line-item tracing and that it is routine to do so with tracing sheets in forensic accounting.

Instead, Turner did a "very easy" calculation for each of the Vanguard accounts, taking the difference between the balance in each account as of September 30, 2016 (a date before the parties' marriage on October 23, 2016), and the balance in the account as of March 31, 2019, and then subtracting the dividends and interest that Turner said each account had earned

during the marriage. Turner stated that his calculation would leave only the account's "appreciation," which "remains separate property or whatever character it is at the start of the time period you're looking at."[2] But as Hora points out, that methodology ignores the reinvestment occurring in the account. *See In re Marriage of Born*, No. 06-08-00066-CV, 2009 Tex. App. LEXIS 2569, at \*3, \*7 (Tex. App.—Texarkana Apr. 16, 2009, no pet.) (mem. op.) (concluding that spouse who offered certain documentary evidence about two mutual fund accounts and certificate of deposit—showing that he had owned them before marriage but not detailing all possible transactions or all income earned on, and reinvested in, those accounts during marriage—failed to trace, by clear and convincing evidence, his separate property into balances in accounts at time of divorce); *Smith v. Lanier*, 998 S.W.2d 324, 332 n.7 (Tex. App.—Austin 1999, pet. denied) (noting that because cash dividends on separately held stock are community property, fact issue as to characterization of securities existed to extent that cash dividends from stock held by one spouse before marriage were reinvested).

On cross-examination, Turner acknowledged that he did not perform an analysis to determine what community income was invested, even as to the Vanguard xx1471 account that he said had earned over $6,000 in dividends and interest:

Q. Well, the Vanguard Rollover IRA brokerage had $6,000 in dividends and interest, correct?

A. Yes.

Q. And you can't tell us what those dividends and interest were invested in, correct? Correct?

---

[2] Turner testified that he knew the Vanguard xx1471 retirement account had earned $6,177.77 in dividends and interest "from looking at all the institution documents and year-end documents which gave the totaling of the dividends and the interest." When the district court asked if that information was "on one of these pages here," Turner acknowledged that it was not.

27

A. Not specifics, no, huh-uh.

Q. Because you didn't—you didn't do the line item tracing of month to month to month seeing if the stock purchases during each month were made with the sale of stock that was before marriage or the stock purchases were made with interest or dividends, correct? That's correct, isn't it?

A. That's correct.

Q. Okay. Instead, you just did the "Well"—I mean, the only credit you're giving the community is just the interest and the dividends, correct?

A. Correct.

By his own admission, Turner did not perform the tracing set forth in section 7.001(c) of the Family Code to determine the separate-property interest in any of the Vanguard accounts. Those accounts generated dividend and interest income that was reinvested into each of the accounts, but Turner's methodology provided no information about whether stock purchases were made using the sale of stock that was in the account before marriage or whether stock purchases were made using the interest or dividends that those accounts earned. Goyal contends that the tracing methodology in subsection 7.001(c) is not the only way to determine a separate-property interest in a defined-contribution plan and that "Turner applied the pro rata methodology" when analyzing the Vanguard accounts, but Turner denied doing so:

Q. By the way, you could have used the pro rata method for the Vanguard accounts, correct?

A. Yes.

Q. And you didn't, right?

A. No. It was—it seemed de minimis.

28

Additionally, as Turner acknowledged, the proper burden of proof is not merely showing that the majority of an asset is separate property:

> Q. Is it correct that that's not a burden; that we can just say generally, "Well, a majority of it's separate property; so, therefore, it's separate property?" That's not the burden, is it?
>
> A. No. That's correct.

Without clear and convincing evidence from Goyal establishing the separate-property interest, the statutory community-property presumption prevails. *See Pearson*, 332 S.W.3d at 364; *see also* Tex. Fam. Code § 3.003(b). Thus, the record supports the district court's finding that Goyal failed to carry his burden of proof as to this separate-property claim.

### b. Novogradac & Company LLP retirement accounts

Next, Turner characterized all the Novogradac retirement accounts—consisting of a 401(k) account, an employer profit-sharing plan, and a Roth 401(k) deferral—as "separate property account[s] existing before the marriage." Turner testified that he analyzed these three accounts collectively, using a pro rata method:

> Q. You did a—the pro rata method using percentages between the two estates, correct?
>
> A. Correct.
>
> . . . .
> Q. And what you did on Novogradac is you did—you just picked a percentage of doing—part of the percentage of the increase on investment gains and the original balance, in part, on salary contributions, correct?
>
> A. Correct. And added the percentage gain to each of those.

Hora's counsel then illustrated the distinct results of applying that pro-rata methodology, rather than line-item tracing, for these types of accounts:

> Q. And the problem with that is—because you don't do the line item tracing of seeing where money actually just went, if I've got $5,000 in community property—let's say income that gets invested—and I've got $5,000 in separate—that's from stock that I owned before marriage—and it both goes to purchase stock. Are you following so far?
>
> A. Yes.
>
> . . . .
>
> Q. So $5,000 in community property gets invested—$5,000 in separate property gets invested. Are you following?
>
> A. Yes.
>
> Q. And then the $5,000 in community goes into, let's just say Apple stock, and then $5,000 goes to Enron stock. And then two years later the Apple stock—let's say it goes nuts and it increases to $20,000; and Enron tanks and goes to zero dollars. Are you following that?
>
> A. Yes.
>
> Q. And so I've got an account that's got $20,000 in it, right?
>
> A. Correct.
>
> Q. And under the pro rata—because $5,000 came from community, 5,000 came from separate, under the pro rata method, this $20,000 is one half separate and one half community, correct?
>
> A. Correct.
>
> Q. That's pro rata. If I do line item tracing, it's 100 percent community and zero percent separate, correct? Is that correct?
>
> A. Well, unless you add the dividends and interest.
>
> Q. I'm just talking about this simple example right here.
>
> A. Well, yes. On that example, correct.

30

Q. And you don't know if that happened in this account because you didn't do line item tracing, correct?

A. No, I didn't have to.

Q. Well, you could've, right? Because you had all the statements, right?

A. Yes, I could have. I chose not to.

Q. It's fair to say that line item tracing is the most accurate way to trace, correct? I mean, we wouldn't be having this conversation if you'd done line item tracing, correct?

A. No.

Q. Well, is that correct?

A. That's correct, yes.

Further, when presented with another example, Turner acknowledged that "small figures can result in big differences" under the pro rata methodology:

Q. Let's say there's $180,000 in separate property in the account at the start of marriage and there's $6,000 in community. And you see I have—let's say 180,000 gets invested in Enron; Enron tanks down to 130; and Apple stock goes from 6- to $30,000. That's certainly something that's possible could have happened in that account, correct?

A. Yeah. It's widely possible, yeah.

Q. And on the pro rata method, you just take the percentages. You say, "Hey, 96.77 percent of this account started out separate. 33.33 percent started out as community. So you just take those percentages to the current balance, and then that's your"—"that's your separate versus community." That's the pro rata method, right?

A. That's correct.

Q. And then that would give you 154,000 of separate and 5,000 thousand of community, correct?

31

A. Correct.

Q. But the reality is if you used line item tracing in this very simple analogy, it'd be 130—in separate and 30,000 in community, correct?

A. Yes.

Q. So small figures can result in big differences; fair?

A. They can, yes.

Peña testified that he had never seen anything supporting use of the pro rata methodology for a retirement or brokerage account and that doing so was inappropriate. He further testified about the difficulty applying that method because of the fluctuating values of such accounts:

Q. And so what type of variety of problems can that methodology cause if you use the pro rata method for a retirement account?

A. Well, I think certainly you—you end up with a—with an incorrect conclusion as to the character of funds in there. And the reason why that is—it is, just to provide some clarity, is brokerage accounts—retirement accounts, they're all at value. You have a value here and a value here, and those values go up and down all over the time. Well, how in the world are you going to—you can't use a pro rata method of the values going up and down. Pro rata method has nothing to do with values. It has—has to do with single cash item transactions.

Q. Cash, right?

A. Cash transactions. That's what it deals with.

Similarly, Texas family law commentators have noted that the pro rata method is used when separate and community funds are held in an account and the party can prove the character of the account's original balance, but not the character of later transactions. *See, e.g.,* Joan Foote Jenkins & Randall B. Wilhite, *O'Connor's Texas Family Law Handbook* ch. 2-A

§ 5.2.2(5) (2021). Under those circumstances, the pro rata method is applied to apportion transactions between the separate and community estates based on the ratio of separate property to community property in the original balance. *Id.* By contrast here, the character of subsequent transactions for the Novogradac accounts was provable, as Turner acknowledged, because he had all the account statements, but he "chose not to" do so. Turner could not rule out any distortion of the separate-property interest through use of the pro rata methodology instead of line-item tracing. Giving due regard to the district court's role as the finder of fact, as we must, we conclude that Goyal has not demonstrated that the evidence was legally or factually insufficient to support the district court's conclusion that he failed to properly trace the transactions to show the separate nature of this property. *See Sink*, 364 S.W.3d at 344-45 (noting that tracing involves "establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property" and that separate property retains its character through series of exchanges "so long as the party asserting separate ownership can overcome the presumption of community property by tracing the assets on hand during the marriage back to property that, because of its time and manner of acquisition, is separate in character").

### 3. Charles Schwab "High Yield Investor Checking" account x1150

Turner stated that this account was part of the separate property brokerage account "with the banking and margin-trading features" (the Schwab One x8922 account) that Goyal opened before marriage. For this account, Turner used the same method that he applied to the three Vanguard retirement accounts, crediting the interest and dividends as the only community property in the account rather than performing line-item tracing to determine the separate-property interest. Turner calculated the difference between the $114,194.66 balance in

account x1150 as of September 30, 2016, and the $2,410.43 balance in the account as of April 8, 2019, and then subtracted the $175.04 of dividends and interest that Turner said each account had earned during the marriage, not accounting for the dividends and interest that were reinvested into the account. *See In re Marriage of Born*, 2009 Tex. App. LEXIS 2569, at *3, *7 (concluding that spouse who did not detail all possible transactions or all income earned on, and reinvested in, mutual fund accounts and certificate of deposit account during marriage had failed to trace, by clear and convincing evidence, his separate-property interest); *Lanier*, 998 S.W.2d at 332 n.7 (concluding that fact issue as to characterization of securities existed to extent that cash dividends from stock held by one spouse before marriage were reinvested). Once again, Turner's methodology provided no information about whether stock purchases were made using the sale of stock that was in the account before marriage or whether stock purchases were made using the interest or dividends that those accounts earned.

Further, Turner's methodology did not consider Goyal's acknowledgement that during the marriage this account "dipped all the way down to, you know, a thousand dollars at some point" and that it "dipped to zero because of all the living expenses." Texas cases state that the party attempting to prove that property is separate must present evidence showing the account balance when the separate property is deposited, the amount and character of withdrawals and deposits, and whether the balance during marriage ever fell below the value of the separate-property interest. *Snider v. Snider*, 613 S.W.2d 8, 10 (Tex. App.—Dallas 1981, no writ) (concluding that savings account balance was husband's separate property after determining that interest earned, deposits, and withdrawals had never reduced account balance to or below husband's identifiable separate interest); *see Fischer v. Fischer*, No. 05-93-00292-CV, 1994 Tex. App. LEXIS 3798, at *7-8 (Tex. App.—Dallas Apr. 21, 1994, writ denied) (not

designated for publication) (concluding that although spouse showed that accounts were funded with her inheritance and gifts, she did not present evidence of amount and character of all deposits and withdrawals made and failed to establish that balances in those accounts never fell below value of her inheritance and gifts; thus, balances in those accounts were presumed community property). Finally, Turner's opinion does not account for the transactions that occurred between this x1150 account and the "Schwab One" brokerage account x8922. In the absence of clear and convincing evidence from Goyal establishing the separate-property interest, the statutory community-property presumption prevails. *See Pearson*, 332 S.W.3d at 364; *see also* Tex. Fam. Code § 3.003(b). Thus, the record supports the district court's finding that Goyal failed to carry his burden of proof as to this separate-property claim.

### 4. KBS REIT account x7353

Goyal testified that he wanted the return of his $10,000 investment that was used to open the KBS REIT account before his marriage to Hora. Goyal noted that, according to Hora's evidence, the account was worth $15,234.84. It is undisputed that Goyal did not trace the separate-property funds for this account. Moreover, Turner provided no opinion about this account in his report and denied having any opinion about the character of this account:

> Q. Looking at your report—the final report that you did on the tracing of the accounts, you did not trace or provide any opinion for a KBS—KBS Strategic Opportunity Retirement Account Number 7353, correct?
>
> A. That's—that's correct.
>
> Q. And just for the record, that's Account—and I guess just to be clear, you don't—and you don't have an opinion one way or the other with regards to the characterization of—and I'm showing you Petitioner's Exhibit 8.
>
> A. No.

Q. —KBS—Let me just finish.

A. Sure.

Q. —KBS Account Number 7353. You don't have an opinion about the character of that, correct?

A. No. I didn't see it on your list, so I didn't address it.

Testimony from Goyal, without tracing, is insufficient to meet the clear-and-convincing evidence necessary to support his separate-property claim. *See McElwee*, 911 S.W.2d at 188 ("Mere testimony that property was purchased with separate funds, without tracing of the funds, is generally insufficient to rebut the [community property] presumption."); *see also McKinley*, 496 S.W.2d at 543, 544 (rejecting separate-property claim where coming to any conclusion about separate-property status would require "surmise and speculation"); *Gaides*, 2001 Tex. App. LEXIS 2930, at *16 (concluding that spouse's testimony that she first purchased stock with funds from proceeds of car that she owned before marriage and "gifting money" from her mother and grandmother was insufficient to rebut statutory presumption that shares were community property). Because there was no tracing for this account, there is no evidence— much less clear-and-convincing evidence—of the claimed separate-property interest and, thus, the community-property presumption prevails. *See Pearson*, 332 S.W.3d at 364; *see also* Tex. Fam. Code § 3.003(b). Thus, the record supports the district court's finding that Goyal failed to carry his burden of proof as to this separate-property claim.

In summary, although Goyal complains that the district court determined his accounts "did not contain any separate property," what the district court actually stated was that he had "failed to carry his burden of proof regarding any separate property claim." Having reviewed this record, we conclude that the district court reasonably could have found that Goyal

36

did not present clear and convincing evidence showing that he properly traced his interest in the assets that he claimed as his separate property. *See Sink*, 364 S.W.3d at 346 (concluding that husband failed to meet his burden of establishing separate nature of property by clear and convincing evidence where he referred generally to trial exhibits consisting of statements from various brokerage accounts, individual retirement accounts, and 401(k) accounts, tax returns for five years, and summaries of various investment accounts but trial court was left to speculate, based on husband's testimony alone, as to what was separate property and what was community property). The evidence presented at trial, considered in the light most favorable to the district court's ruling, shows that the district court reasonably could have formed a firm belief or conviction that Goyal did not present clear and convincing evidence proving his separate-property interest in the accounts. And all the evidence, considered in a neutral light, shows that a reasonable fact finder could have formed a firm belief or conviction that Goyal's assertion of a separate-property interest in these accounts was not proven. Further, the district court's determination as to Goyal's separate-property claim is not so against the great weight and preponderance of the evidence as to be manifestly unjust. Thus, the evidence is both factually and legally sufficient to support the district court's determination that the community-property presumption as to these accounts was not rebutted. *See* Tex. Fam. Code § 3.003(b); *Pearson*, 332 S.W.3d at 363-64; *Ganesan*, 96 S.W.3d at 354.

### 5. Reimbursement claim

Goyal complains that the district court did not recognize his claim for reimbursement. His live pleading made this reimbursement claim:

> Counterpetitioner's separate estate has expended funds or assets for payment of the community estate giving rise to a claim for reimbursement in favor of

Counterpetitioner's separate estate and against the community estate. Those expenditures resulted in a direct benefit to the community estate. Counterpetitioner's separate estate has not been adequately compensated for or benefitted from the expenditure of those funds or assets, and a failure by the Court to allow reimbursement to Counterpetitioner's separate estate will result in an unjust enrichment of the community estate at the expense of Counterpetitioner's separate estate.

During opening statement, Goyal's counsel said that Goyal "want[ed] a reimbursement" for $115,000 that he put down on a house that Goyal and Hora bought during the marriage. During trial, Turner opined that there was a "reimbursement claim" for the down payment on the house but he denied that there was any separate-property interest in the house. Hora's counsel pointed out to the court that Goyal's $115,000 "reimbursement" claim on his proposed disposition of issues[3] was not a reimbursable claim under the Family Code.

The party claiming a right to reimbursement has the burden of pleading and proving that the expenditures and improvements were made and that they are reimbursable. *Vallone v. Vallone*, 644 S.W.2d 455, 459 (Tex. 1982); *Willett*, 2017 Tex. App. LEXIS 5096, at *7 ("A right to reimbursement may arise when the resources of one estate are utilized to benefit another estate without receiving any shared benefit or enjoyment in return."). Trial courts "may not recognize" a claim for reimbursement for "the living expenses of a spouse or the child of a spouse." Tex. Fam. Code § 3.409(2); *see Norris v. Vaughan*, 260 S.W.2d 676, 683 (Tex. 1953) (concluding that separate funds spent for community living "should be deemed a gift to the community for its well-being and use"); *Elmakiss v. Elmakiss*, No. 12-06-00405-CV, 2008 Tex. App. LEXIS 4195, at *8 (Tex. App.—Tyler June 11, 2008, no pet.) (mem. op.) (concluding that

---

[3] Goyal's proposed property division, which is Respondent's Exhibit 2, shows the marital home as awarded to him and states "$115,000 separate property to H," which is expressly classified as "Reimbursement for down payment on house."

evidence on spouse's reimbursement claim failed to show that expenditures were not for "the living expenses of either spouse or the child"). Although the Family Code addresses proportional ownership of property owned by the marital estates, *see* Tex. Fam. Code § 3.006, Goyal did not plead that claim, Turner disavowed that claim during trial, and it was not included in Goyal's pretrial proposed property division and disposition of issues as required by the Travis County Local Rules, s*ee* Travis County (Tex.) Dist. Ct. Loc. R. 23.3(3). Under Rule 23.8(3) of those local rules, "All issues not stated in pre-trial forms as required by these procedures will [be] deemed waived except upon a showing of good cause for failure to comply with these rules." As to Goyal's pleaded reimbursement claim, we conclude that subsection 3.409(2) of the Family Code precluded his recovery for the down payment on the house that he and Hora purchased after their marriage and in which he lived with his wife and son. *See* Tex. Fam. Code § 3.409(2).

Based on the foregoing discussion, we conclude that the district court had legally and factually sufficient evidence on which to exercise its discretion when determining Goyal's separate-property claims, and that it did not err in the application of that discretion when characterizing the marital estate. *See Coburn*, 433 S.W.3d at 823; *Zeifman*, 212 S.W.3d at 588. We overrule Goyal's second issue.

## CONCLUSION

We affirm the district court's August 29, 2019 Final Decree of Divorce.

_____

Gisela D. Triana, Justice

Before Justices Goodwin, Triana, and Smith

Affirmed

Filed:   May 27, 2021